SIXTH DIVISION
December 22, 2006

No. 1-04-2372

| | | |
|---|---|---|
| JANE DOE, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee and Cross-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 L 5079 |
| | ) | |
| ELIZABETH DILLING, Individually, and | ) | |
| as Executor of the Estate of Kirkpatrick Dilling, | ) | |
| Deceased, | ) | |
| | ) | |
| Defendants-Appellants and Cross-Appellees | ) | |
| | ) | |
| (Dilling and Dilling, | ) | Honorable |
| | ) | Leonard L. Levin, |
| Defendant). | ) | Judge Presiding. |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Plaintiff Jane Doe contracted HIV from her fiancé, Albert Dilling (Albert). Three weeks

after Doe tested positive for HIV, Albert died of AIDS. Doe sued Albert's estate and his elderly

parents, Elizabeth (Betty) and Kirkpatrick (Kirk), alleging that Albert, Betty and Kirk had

misrepresented Albert's condition to her, which caused her to become infected with HIV.[1] It was

soon discovered that Albert's estate had no assets and a negative net worth, and Doe dropped it

as a defendant. In the course of pretrial proceedings, Doe amended her complaint a number of

times. At the time of trial, there were two counts directed at Betty and Kirk (collectively, the

---

[1]Doe also sued Kirk's law firm, Dilling & Dilling, for malpractice unrelated to her

contracting HIV. The legal malpractice claim is not at issue in this appeal.

Dillings) which are at issue in this appeal: count I, alleging negligent misrepresentation against both Dillings, and count II, alleging fraudulent misrepresentation against both Dillings. Those counts were tried before a jury. At the end of the trial, the judge entered a directed verdict in the Dillings' favor on the fraudulent misrepresentation count. The negligent misrepresentation count ended in a mistrial due to a hung jury, and the case was returned to a trial call and assigned to a different judge. Before the second trial commenced, Kirk died, and his estate was substituted as a defendant. At the second trial, Doe's theory of the case was that because of the Dillings' misrepresentations, she was unaware that Albert had infected her with HIV and, consequently, she failed to get treatment that would have prevented much of the irreparable damage she sustained to her immune system. At the close of evidence, the second judge directed a verdict in defendants' favor on the negligent misrepresentation count, the count that had originally ended in a mistrial, and submitted the fraudulent misrepresentation count to the jury. The jury found for Doe and awarded her $2 million in compensatory damages. For the reasons that follow, we vacate the judgment entered on the jury's verdict finding defendants liable for fraudulent misrepresentation and awarding Doe compensatory damages. We affirm the remainder of the judgment.

                                        BACKGROUND

        In her latest (fifth amended) complaint, Doe alleged that she met and began to date Albert in April of 1996. Doe would later testify that she and Albert, who unbeknownst to her was HIV-positive, began to have unprotected sex in August of 1996. Doe alleged that between the spring of 1997, when she first met the Dillings, and November of 1999, when she independently learned

that Albert had AIDS, the Dillings negligently (count I) or fraudulently (count II) misrepresented to her Albert's condition by telling her, on many occasions, that Albert was suffering from heavy metal poisoning and/or from Lyme disease. Doe further alleged that she reasonably relied, to her detriment, on the Dillings' representations. Doe asserted that had she learned in the spring of 1997 the true nature of Albert's ailment, she would have immediately obtained HIV testing for herself and, if she was then already infected, would have immediately commenced treatment.

Both parties state in their briefs that at the end of the first trial, in April of 2003, Judge Devlin entered a directed verdict in the Dillings' favor on the fraudulent misrepresentation count. However, as defendants acknowledge, the record on appeal does not include an order to that effect. Neither party asserts that a finding was ever made, pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a) (2002)), that the directed verdict on the count of fraudulent misrepresentation constituted a final and appealable judgment. Our examination of the record revealed no reference to such finding ever being made.

The negligent misrepresentation count ended in a mistrial due to a hung jury. Doe did not file a posttrial motion attacking the propriety of the directed verdict on the count of fraudulent misrepresentation.

The matter was returned to a trial call and reassigned to another judge, Judge Levin. Prior to the second trial, the parties' attorneys had some discussion with Judge Levin as to whether, in general, a directed verdict carries over to a second trial. That discussion occurred in the context of whether to allow the use of testimony from the first trial. However, defendants' attorneys did not argue that the directed verdict on the fraudulent misrepresentation count should

3

stand and the matter be retried only with respect to the count which ended in a mistrial—namely, the negligent misrepresentation count.

The second trial was held in February and March of 2004. The jury was impaneled and heard the following testimony. To the extent that the parties bring to our attention any inconsistencies between the testimony at the first and the second trials, such inconsistencies will be noted below.

Doe testified as follows. She was college-educated, but received no medical training. Doe met Albert in April of 1996 through an ad in the Chicago Reader. At that time, she was 44 and he was 41. At the beginning of their courtship, Albert looked healthy. Doe and Albert saw each other frequently in June and July of 1996, but did not become physically intimate for some time. Doe had previously been tested for HIV in 1991, when she applied for a disability insurance. The test result was negative. Doe volunteered to Albert that she was disease-free and had practiced safe sex. Doe additionally told Albert that she was very aware of sexually transmitted diseases and did not want to expose herself to any. Doe then asked Albert if he had anything to tell her on the subject. She believed Albert's answers to her questions.[2]

Doe further testified that she expressed to Albert that she wanted to be married to him and have his child. With that in mind, Doe and Albert had unprotected sex in late August of 1996. Doe noticed that Albert's penis had dark-colored pigmentation which looked unusual to her. Doe

---

[2]Because Albert was deceased, Doe, in most instances, was not allowed to testify as to what he had told her, as such statements are generally inadmissible under the Dead-Man's Act (735 ILCS 5/8-201 (West 2002)).

asked Albert about it, and he told her that he had previously suffered from genital warts and had them surgically cauterized. Albert explained that he was a landscaper and would get warts on his hands from handling plant material; he claimed that the warts on his genitals were of similar origin. In August and September of 1996, Doe noticed a problem with Albert's ability to walk straight; he was a little unstable on his feet.

Doe's testimony continued as follows. In early September of 1996, Doe herself became ill. She had flu-like symptoms with high fever. Doe testified that, thinking it was just flu, she did not see a doctor. Doe stated that she made no connection between her flu-like illness and having had unprotected sex with Albert.

In the fall of 1996, Albert went to Wyoming to buy a bar/restaurant. According to Doe, when she visited Albert in Wyoming in early 1997, Albert looked "a little worn out. He was tired." Doe also noted that Albert was thin. In this regard, during the first trial Doe testified that Albert had lost quite a bit of weight, and his skin was very dry, almost ashen looking. Doe asked Albert about his appearance and believed his answer. During Doe's visit to Wyoming, Albert proposed to her. In spring of 1997, Albert invited Doe to Reno, Nevada. Doe understood that Albert was in Reno to see a doctor for heavy-metal poisoning. Doe went to Reno, but did not go to the clinic with Albert.

In mid-May of 1997, Doe met the Dillings for the first time. Doe either earlier or at that time learned that Kirk was a prominent attorney who specialized in food and drug litigation. During that first meeting, the topic of Albert's health and medical care came up. Doe testified that Betty had stated that she and Kirk were in charge of Albert's medical care; that Kirk was a

medical expert in these matters and they were very concerned about Albert's health; and that Albert would be fine. In that context, Doe was told that Albert's only problem was heavy-metal poisoning.[3]

According to Doe, over the next 2 1/2 years the topic of Albert's health came up in numerous conversations with the Dillings, both in person and by phone. At no time was Doe told that Albert may have AIDS. Doe was told that Albert had heavy-metal poisoning and, later, Lyme disease. Doe testified to various specific instances when she had such conversations with the Dillings, which instances will be related here in the context in which the conversations occurred. For instance, when at Christmastime of 1997, Doe discussed the issue with Betty, Betty maintained that Albert's problem was heavy-metal poisoning and that he was in the care of the right doctors and would eventually be well. Kirk, in his evidence deposition which was read to the jury at the second trial, admitted that he never told Doe that Albert was HIV-positive.

According to Doe, the Dillings paid for most of Albert's medical care. Many of the doctors Albert saw were professional acquaintances of Kirk. Despite the care Albert received, his health continued to deteriorate. In October of 1998, Albert had a stroke and was taken by ambulance to a hospital. When at Christmastime of 1998, Doe and Albert visited with Doe's mother in Michigan, Albert had such severe abdominal pain that Doe and her mother took him to a local emergency room. After returning from Michigan, in late December of 1998 or early

---

[3]As was the case with Albert's statements to Doe, because at the time of the second trial Kirk was deceased, Doe, in most instances, was not allowed to testify as to what he had told her. However, Kirk's evidence deposition was read to the jury at the second trial.

January of 1999, Doe brought up the subject of HIV and AIDS in her conversation with Betty. In addition to describing Albert's emergency room visit, Doe described to Betty Albert's other symptoms, including that Albert had recently showed her, after going to the bathroom, a toilet bowl full of blood. Betty suggested that Albert was suffering from food poisoning. Doe insisted that Albert was more seriously ill and further stated, "if I didn't know better I would say he looked almost like a man who has AIDS. Could he have AIDS?" Betty said it was not so. This conversation was conducted within the earshot of Kirk, who participated in it.[4] At a later date, Doe suggested taking Albert to the Mayo Clinic for an evaluation. Betty, in Kirk's presence, decided against it.

Doe further testified that although she and Albert had not yet married, she felt like the Dillings' daughter-in-law. She believed the Dillings' statements about Albert's health and was waiting for him to get better. After Doe and Albert got back to Chicago from the trip to Michigan, Albert stayed in Doe's condominium and she took care of him for almost a year, until his death in November of 1999. That included cooking for Albert, feeding him when he could not feed himself, bathing him, dressing and undressing him, assisting him in going to the bathroom, and cleaning up after him. Doe was also working in order to support both of them financially. During that time period, Doe spoke to the Dillings at least every other day. Betty, within Kirk's earshot, continued to maintain that Albert suffered from heavy-metal poisoning and, later, Lyme

[4]Again, other than Kirk's evidence deposition where he admitted that he never advised Doe that Albert had AIDS, Kirk's responses were precluded by defendants' Dead-Man's Act objections.

disease.

Doe further testified that in May or June of 1999, Albert started seeing Dr. Hauser, an acquaintance of Kirk. Doe went along with Albert to every visit. On June 24, 1999, Dr. Hauser diagnosed Albert with Lyme disease. Doe called Betty and told her, "We finally have a diagnosis. Now we know what's really wrong with Albert." Toward the end of summer of 1999, Doe began to notice changes in her own physical condition. Her hair was falling out; her gums bled profusely when she brushed her teeth; her skin started to split and get sores. Doe attributed those symptoms to being a full-time caretaker in addition to working, as well as to lack of sleep, exercise and self-care. During this period, she did not see a doctor. By September or October of 1999, there was still no improvement in Albert's condition. Doe questioned Dr. Hauser about that and he suggested that Albert see another doctor. Albert next saw Dr. Waitley, who tested him for HIV. On November 2, 1999, in Doe's presence, Dr. Waitley advised Albert that he was HIV-positive. Doe promptly sought HIV testing for herself and learned that she too was HIV-positive.

Doe admitted that she did not seek medical care in connection with her HIV infection until March of 2000, when she saw Dr. Douglas Finlayson. Doe further testified that Dr. Finlayson did not prescribe any anti-retroviral drugs, but rather told her to take vitamin supplements. In March of 2001, Doe saw Dr. Michele Till, who was medical director of the Women's AIDS clinic at Northwestern Memorial Hospital. In May of 2001, Dr. Till started Doe on highly active anti-retroviral therapy.

Kirk, in his evidence deposition, testified that he was an internationally recognized attorney specializing in food and drug law. Kirk had represented many doctors and some

8

healthcare institutions. His clients included Dr. Douglas Brodie; Dr. Fuller Royal, who practiced in Nevada; Dr. Helmut Keller, who practiced in Germany; and Dr. Hauser. Kirk, by virtue of his professional experience and through popular media, was aware of a disease known as HIV/AIDS which affected the immune system. Kirk, however, denied that Albert had AIDS and expressed a belief that Dr. Waitley had misdiagnosed Albert's condition "and then killed him with drugs that caused his death in less than three weeks."

Kirk further testified that in 1992 he recommended to Albert that he see Dr. Keller in Germany about his genital warts. Kirk was extensively questioned about his knowledge, during the relevant time period, as to whether Dr. Keller treated immune system disorders. In this regard, Kirk stated that Dr. Keller's specialty was treatment of cancer, and that Dr. Keller did not treat HIV. Kirk admitted that he knew that Dr. Keller in his practice utilized a certain treatment modality called "Carnivora," but denied that he knew that Dr. Keller's practice concentrated in utilizing Carnivora treatments. Kirk also denied that by 1997, he knew that Carnivora was used to treat the immune system, stating that he understood Carnivora to be used to treat cancer. On this point, Doe's counsel attempted to impeach Kirk by prior statements he had made in his discovery deposition, where Kirk denied that Carnivora was a cancer remedy and stated that Carnivora was a remedy for the immune system. Kirk then responded that Carnivora "affects the immune system." We note that no expert evidence was introduced to the jury as to whether Carnivora was, in fact, an immune system treatment.

Doe's counsel also questioned Kirk about why he did not list Dr. Keller in his answers to the interrogatories which asked to identify all physicians who treated Albert from 1992 until his

9

death. Kirk responded that he listed Dr. Keller's clinic.

Kirk further testified that in the mid-1990s he recommended that Albert see Dr. Royal at the Nevada clinic. Kirk had also recommended to Albert certain treatments he knew about. One of the treatments was known as chelation therapy.[5] In the late 1990s, Kirk recommended that Albert see Dr. Hauser, who subsequently became his client. Over the years, Kirk and Betty paid thousands of dollars for Albert's medical treatment.

Kirk admitted that he told Doe that Albert suffered from heavy-metal poisoning and/or Lyme disease. Kirk stated that he never told Doe that Albert had HIV/AIDS because "he didn't."

James Walgreen, the Dillings' former son-in-law, testified in his evidence deposition to the following. Walgreen was recently divorced from the Dillings' daughter Victoria. Walgreen recalled that when he was still married to Victoria, he, Victoria and the Dillings discussed Albert's health on several occasions. Walgreen stated that he and Victoria were concerned about Albert's health and were told that Albert had Lyme disease and lead poisoning. Walgreen further testified that "[a]pproximately a year before [Albert] passed away," when he and Victoria were visiting the Dillings at their home, Betty, in Kirk's presence, mentioned that Albert was suffering from AIDS. The conversation took place in the sunroom of the Dillings' home. This was the only time either of the Dillings mentioned the subject of Albert's HIV/AIDS in Walgreen's presence. According to

_____

[5]We note that Webster's online dictionary defines chelation therapy as "the use of a chelator (as EDTA) to bind with a metal (as lead or iron) in the body to form a chelate so that the metal loses its chemical effect (as toxicity or physiological activity)." See http://www.m-w.com/dictionary/chelation%20therapy.

Walgreen, when he suggested informing Doe that Albert had AIDS, the Dillings told him to keep quiet because it was none of his business.

Defendants' attorneys extensively questioned Walgreen about his bias against the Dillings. Walgreen testified that he filed for divorce from Victoria in August of 2000, after almost 20 years of marriage, and that the divorce became final in January of 2002. Walgreen denied being biased against the Dillings and stated that he liked Kirk.

Betty was initially called to testify as an adverse witness pursuant to section 2-1102 of the Code of Civil Procedure (the Code) (735 ILCS 5/2-1102 (West 2002)). Subsequent to that, she took the stand on her own behalf.

In her nonadverse testimony, Betty testified that until Albert was diagnosed with Lyme disease in 1999, the only ailment she was aware Albert was suffering from was heavy-metal poisoning. In 1999, Betty learned that Dr. Hauser diagnosed Albert with Lyme disease. Betty admitted that until she learned of that diagnosis, she told Doe that Albert's only problem was heavy-metal poisoning and that he would get better. Betty testified consistently with Kirk that they helped Albert with his medical bills. Betty further testified that she did not want Albert evaluated at the Mayo clinic because "Albert had no health insurance and it was prohibitively expensive." Betty admitted that she had a conversation regarding Albert's health with Doe after Doe and Albert returned from Michigan in December of 1998 or January of 1999. She denied, however, that the subject of AIDS was ever brought up in that conversation. Betty further stated that she never discussed the subject of AIDS with Doe and never heard Doe bring up the subject in her presence.

11

Betty also denied that the November of 1998 conversation Walgreen testified about—in which she supposedly had stated that Albert had AIDS—ever took place. In this regard, Betty indicated that the Dillings did not use the sunroom of her home where, according to Walgreen, the conversation took place, because it was unheated and, additionally, Kirk would only be able to get into the sunroom with great difficulty because he used a walker and the sunroom had steps he was afraid to navigate.

In her section 2-1102 testimony as an adverse witness, Betty admitted that she and Kirk discussed Albert's health with Doe on many occasions, both in person and over the phone. In the context of discussing Albert's health, Kirk, "on some occasions," held himself out to Doe as someone having specialized knowledge in the field of health. Betty further admitted that she and Kirk were very much involved in Albert's health care and medical treatment, and that Kirk referred Albert to many doctors. Betty further admitted that she and Kirk "conferred with those doctors from time to time." Because Kirk held himself out as an expert in medical matters, he had most of the direct contact with Albert's doctors. "Occasionally" Kirk would receive and review the doctors' records and reports. Kirk shared with Betty what he had learned after conferring with Albert's doctors. Betty stated that she did not understand those things.

Betty acknowledged that by early 1997, she was aware of a disease known as HIV/AIDS and that it could be transmitted through sexual contact.

Betty testified that she was aware who Dr. Keller was and that he had been a client of Kirk's. Betty was also aware that Kirk had arranged for Albert to be treated by Dr. Keller in Germany. Betty admitted that Kirk had communicated with Dr. Keller after Albert's treatment.

12

Doe's counsel questioned Betty, as he did Kirk, about why she did not list Dr. Keller in her answers to the interrogatories which asked to identify all physicians who treated Albert from 1992 until his death. Betty, similar to Kirk, responded that she listed Dr. Keller's clinic.

Victoria Dilling, in her evidence deposition, denied that the conversation Walgreen referred to in his testimony ever took place. Victoria testified consistently with Betty that the Dillings did not use the sunroom where the conversation supposedly took place because Kirk was afraid to use the stairs leading to it. Victoria further stated that in the 20 years she was married to Walgreen, she, Walgreen and the Dillings never had any conversations about sex because Kirk was "very conservative." Victoria also stated that she, Walgreen and the Dillings never discussed the subject of AIDS and that she did not know Albert had AIDS until he was diagnosed by Dr. Waitley. Regarding her divorce from Walgreen, Victoria stated that it was "extremely difficult."

Dr. Joel Cornfield, in his evidence deposition, testified that he was a successor to the urology practice of a friend of Kirk, but indicated that he personally did not know Kirk. Dr. Cornfield treated Albert in 1992 for genital warts, a condition he characterized to be a sexually transmissible disease. Dr. Cornfield testified that Albert then told him he was HIV-positive.

Dr. John McGillen, an expert hired by defendants, testified via evidence deposition and live testimony. Dr. McGillen was in private practice, specializing in internal medicine and infectious diseases. Over the years, Dr. McGillen treated a number of patients infected with HIV; however, he acknowledged that his experience with HIV was "relatively limited" and only 1% of his patients were HIV-positive. Dr. McGillen testified that he had reviewed Dr. Keller's records, which were given to him by defendants' counsel. The records showed that Albert was HIV-

13

positive in 1992. After reviewing Albert's other medical records provided to him by defendants' counsel, Dr. McGillen opined that Albert did not suffer from Lyme disease and that there was no evidence Albert suffered from heavy-metal poisoning.

Regarding Doe's flu-like illness in September of 1996, Dr. McGillen opined that it is "certainly very possible" that Doe was then experiencing an episode of acute HIV infection. Dr. McGillen additionally opined that although it is "very beneficial" to aggressively treat a newly infected individual with anti-retroviral therapy, the period during which such treatment is of benefit is short. "Certainly six months after [an individual becomes] infected it is of no value." According to Dr. McGillen, delays in treatment after the initial six-month period following contracting HIV are acceptable and may even be desirable because of side effects of anti-retroviral drugs. Lastly, Dr. McGillen opined that the delay of 2 1/2 years in diagnosing Doe's HIV infection "had no effect at all on her prognosis or survival rate[]."

Dr. Finlayson, a family practitioner, testified that he performed various tests on Doe between March of 2000 and February of 2001. Consistent with Doe's testimony, Dr. Finlayson further testified that he did not prescribe anti-retroviral therapy. In February of 2001, Dr. Finlayson advised Doe to see an HIV specialist.

Dr. Till, Doe's treating physician who, as noted, was medical director of the Women's AIDS clinic at Northwestern Memorial Hospital, testified via evidence deposition. In addition, she was cross-examined live. Dr. Till opined that the flu-like symptoms Doe experienced in September of 1996 were an indication that she became infected with HIV in late summer of 1996, as a result of having unprotected sex with Albert. Dr. Till further opined that Doe would "most

14

likely" have seroconverted, *i.e.*, tested positive for HIV by the spring of 1997. Dr. Till explained that seroconversion "can occur from anywhere from a couple of weeks to a few months" after a person is exposed to the HIV virus, and that "the vast majority" those exposed to HIV seroconvert within six months.

In the spring of 2001, Dr. Till diagnosed Doe with AIDS. According to Dr. Till, Doe was a "rapid progressor"—someone in whom the virus reproduces quickly, causing rapid progression to "full blown" AIDS—and Doe's lack of treatment before May of 2001 caused irreversible damage to her immune system. Specifically, Dr. Till testified that in May of 2001, prior to being started on anti-retroviral therapy, Doe had a "CD-4" cell count of 123, indicating that she had AIDS, and, as such, even with treatment, Doe belonged in a category of patients who are at a significantly higher risk of death than those who started treatment in earlier stages of the disease, before their CD-4 counts fell below 200. With regard to Doe's delay in treatment attributable to her not knowing that she was HIV-positive, Dr. Till opined that without the delay, Doe "would have done better, perhaps not progressed to AIDS," explaining that, in general, "treating someone stops the progression of HIV if they respond well to the medication \*\*\*. Any delay in [treating] a rapid progressor \*\*\* will lead to a more advanced HIV disease." Dr. Till reiterated that earlier treatment would have prevented Doe from developing AIDS. Regarding the impact of stress Doe experienced in the last year of Albert's life, Dr. Till opined that the stress probably caused Doe to "progress further in her disease than she may have had she had a stable, calm environment in which to live."

At the close of evidence, defendants moved for a directed verdict on both counts. At no

time did defendants' counsel bring to Judge Levin's attention the fact that his predecessor, Judge

Devlin, had already directed a verdict in defendants' favor on the count of fraudulent

misrepresentation.  Judge Levin, as noted, directed a verdict in defendants' favor on the negligent

misrepresentation count and submitted the fraudulent misrepresentation count to the jury.  Judge

Levin further directed a verdict in defendants' favor on all claims for punitive damages.  After

learning that the fraudulent misrepresentation count would go to the jury, defendants' counsel

argued at great length about how the jury was to be instructed on fraudulent misrepresentation.

The jury, in a general verdict, found defendants liable and awarded Doe $2 million in

compensatory damages.  Judge Levin entered judgment on the verdict.

On June 25, 2004, defendants' posttrial motion for a judgment notwithstanding the verdict

or, in the alternative, for a new trial was denied.  On July 21, 2004, defendants timely filed a

notice of appeal, and on July 29, 2004, Doe timely filed a notice of cross-appeal.  We granted the

AIDS Legal Council of Chicago (the Council) leave to file an *amicus curiae* brief.

ANALYSIS

On appeal, defendants contend that they were entitled to a directed verdict on the

fraudulent misrepresentation count.  Doe, on cross-appeal, contends that Judge Levin erred in

directing a verdict in defendants' favor on the count of negligent misrepresentation and on all

claims for punitive damages.

I.  Preliminary Procedural Issue

As a preliminary matter, defendants assert that Judge Levin erred in submitting the

fraudulent misrepresentation count to the jury, given that Judge Devlin had previously directed a

16

verdict in defendants' favor on that count. Defendants do not attempt to develop this contention other than on very narrow grounds which, as shall be shown below, are unpersuasive. Specifically, defendants assert that because Doe did not file a posttrial motion after the first trial, which ended in a mistrial of the negligent misrepresentation count, the directed verdict on the count of fraudulent misrepresentation became final, and Judge Levin, who presided over the second trial, did not have the power to alter it or submit it to the jury. In support, defendants rely on section 2-1202(c) of the Code, which provides, in pertinent part:

"Post-trial motions must be filed within 30 days after the entry of judgment or the discharge of the jury, if no verdict is reached, or within any further time the court may allow within the 30 days or any extensions thereof." 735 ILCS 5/2-1202(c) (West 2002).

Defendants predicate their entire procedural argument on the section 2-1202(c) issue, namely, Doe's failure to file a posttrial motion after the first trial. Defendants contend that in the absence of a timely posttrial motion following a mistrial of one count and a directed verdict contemporaneously entered on another count, the circuit court, after the lapse of 30 days, loses jurisdiction to vacate or modify the directed verdict. Relying on Cherny v. Fuentes, 271 Ill. App. 3d 1071, 649 N.E.2d 519 (1995), which interpreted section 2-1202(c), defendants contend that the circuit court here lost its jurisdiction even though no Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) finding was made as to the directed verdict's immediate appealability.

Doe, relying on Rule 304(a), argues that defendants' argument is flawed conceptually in that it fails to recognize that a posttrial motion is not a prerequisite for a trial court to retain

17

jurisdiction to vacate or modify a directed verdict where other claims in the matter remain pending and undetermined. Doe further argues that a posttrial motion is not ever required after a directed verdict. In support of this position, Doe relies on Keen v. Davis, 38 Ill. 2d 280, 282, 230 N.E.2d 859 (1967) (holding that a posttrial motion is not required after a grant of a directed verdict), and Fitzpatrick v. ACF Properties Group, Inc., 231 Ill. App. 3d 690, 709, 595 N.E.2d 1327 (1992) ("the general rule is that a post-trial motion need not even be filed to raise the issue on appeal of the granting of directed verdicts").

As shall be demonstrated below, it is not at all clear that the court in Cherny based its decision on jurisdictional grounds. Although the court appears to begin its analysis by invoking jurisdictional principles in stating, "The failure to file a post-trial motion in a timely fashion deprives the circuit court of jurisdiction to entertain the motion, and the issues contained in a late-filed post-trial motion are not properly preserved for appeal," it concludes its discussion by stating, "This issue is waived." Cherny, 271 Ill. App. 3d at 1076-77. Moreover, Cherny appears to be inconsistent with our supreme court's decision in Keen, which it did not discuss.

In Cherny, three Cherny plaintiffs brought claims against two defendants, Thelma Fuentes and Boris Stulov. At the beginning of the trial, the circuit court directed a verdict against one of the plaintiffs, Serge Cherny, as a sanction for not showing up for trial. The very next day, the plaintiffs moved for reconsideration of the directed verdict against Serge. The circuit court denied that motion. The trial proceeded with respect to the claims of the remaining plaintiffs. Following the presentation of evidence and closing arguments, the jury became deadlocked, and a mistrial was declared with respect to the claims tried before the jury. The plaintiffs filed no

posttrial motions. More than two months later, the matter proceeded to trial a second time. At the beginning of the second trial, the plaintiffs moved to vacate the directed verdict against Serge entered at the first trial. That motion was denied. In addition, at the close of evidence at the second trial, the circuit court directed a verdict in favor of the defendant Stulov. The second trial also ended in a mistrial as to the remaining claims against the defendant Fuentes, and the circuit court apparently set the matter for a third trial. Approximately two weeks after the second mistrial, the plaintiffs filed a posttrial motion to vacate all orders entered in the course of the *first* trial, including the directed verdict against Serge. The circuit court denied the plaintiffs' motion and, shortly thereafter, certified, pursuant to Rule 304(a), that the directed verdict against Serge, as well as the court's denial of the plaintiffs' motion to vacate all orders entered in the course of the first trial, were final and appealable. The plaintiffs timely appealed. Cherny, 271 Ill. App. 3d at 1073-74. On appeal, this court affirmed the directed verdict against Serge. Cherny, 271 Ill. App. 3d at 1077.

Defendants would seek to contend that, in its affirmance of the directed verdict in Cherny, this court interpreted section 2-1202(c) to be addressing the circuit court's jurisdiction following a mistrial. As noted, this court began its analysis by stating, "[t]he failure to file a post-trial motion in a timely fashion deprives the circuit court of jurisdiction to entertain the motion, and the issues contained in a late-filed post-trial motion are not properly preserved for appeal." Cherny, 271 Ill. App. 3d at 1076. However, while Cherny appears to invoke a jurisdictional issue at the outset of its analysis, it predicates its conclusion not on the loss of the circuit court's jurisdiction to modify or vacate a directed verdict, but on waiver:

19

"Plaintiffs' arguments that they were simply waiting for the matter to be set for trial again and that whether they filed their post-trial motion within 30 days of the mistrial order is irrelevant are not persuasive. The statute specifically covers the circumstances of this case, and plaintiffs failed to meet the requirements of the statute. They did not file their post-trial motion within 30 days of the discharge of the jury, and the court did not grant an extension. *This issue is waived*." (Emphasis added.) Cherny, 271 Ill. App. 3d at 1077.

Moreover, Cherny's holding, whether predicated on waiver or jurisdictional grounds, is contrary to our supreme court's decision in Keen, where the supreme court held that a posttrial motion is not required be filed after a grant of a directed verdict. The supreme court explained:

"Supreme Court Rule 240, effective January 1, 1967, [Ill. Rev. Stat. 1967, ch. 110A, par. 240,] reads: 'The order of the court granting a motion for a directed verdict is effective without any assent of the jury.' It follows the prevailing trend of doing away with useless form and, as noted by the committee comment, the new rule 'eliminates an archaic and futile ceremony.' We see nothing in the statute to indicate a legislative intent that a post-trial motion be filed after a directed verdict. In fact, the contrary is indicated since no such motion is required in non-jury cases, (section 68.3) [now section 2-1203 of the Code] or cases in which a jury has failed to reach a verdict. (Section 68.1(5).)" Keen, 38 Ill. 2d at 282.

We note that the language of section 2-1202(c), formerly section 68.1(3), has remained unchanged since Keen was decided. Compare 735 ILCS 5/2-1202(c) (West 2002) to Ill. Rev.

20

Stat. 1967, ch. 110, par. 68.1(3). Accordingly, we must take the pertinent requirement of section 2-1202(c) to address the preservation for appeal of only those issues that inhere in the mistrial itself, and not, contrary to the holding in Keen, apply with respect to a directed verdict on a separate claim which was never submitted to a jury.

Defendants' contention is also counterintuitive in light of Rule 304(a), which makes clear that where a judgment does not dispose of all claims, the circuit court does not lose the power to revise a prior final order disposing of a definite part of litigation, unless the court certifies such order to be final and appealable:

> "If multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both. Such a finding may be made at the time of the entry of the judgment or thereafter on the court's own motion or on motion of any party. *** *In the absence of such a finding, any judgment that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before the entry of a judgment adjudicating all the claims, rights, and liabilities of all the parties.*" (Emphasis added.) 155 Ill. 2d R. 304(a).

Here, because the negligent misrepresentation count ended in a mistrial, necessitating a retrial of that count, and because the circuit court never entered a Rule 304(a) certification with respect to

21

the directed verdict on the count of fraudulent misrepresentation, the directed verdict, although disposing of a definite part of litigation, was interlocutory in nature and, as such, "may be modified or vacated at any time before final judgment." Leopold v. Levin, 45 Ill. 2d 434, 446, 259 N.E.2d 250 (1970); accord Citicorp Savings of Illinois v. First Chicago Trust Co. of Illinois, 269 Ill. App. 3d 293, 297, 645 N.E.2d 1038 (1995) (if the trial court's order does not include an express written finding that there is no just reason for delaying either enforcement or appeal or both, the order is subject to revision at any time before the entry of an order which adjudicates all the claims, rights and liabilities of the parties).[6] Moreover, we note that even if it could be said that the circuit court lost jurisdiction over the directed verdict, the parties revested it with jurisdiction by actively participating, without any objection from defendants, in submitting the count of fraudulent misrepresentation to the jury at the second trial. See People v. Kaeding, 98 Ill. 2d 237, 240-41, 456 N.E.2d 11 (1983) ("litigants may revest a court which has general jurisdiction over the matter with both personal and subject matter jurisdiction *** after the 30-day period following final judgment during which post-judgment motions must ordinarily be filed. *** In order for the rule to apply, the parties must actively participate without objection in proceedings which are inconsistent with the merits of the prior judgment"); accord Djikas v. Grafft, 344 Ill. App. 3d 1, 13, 799 N.E.2d 887 (2003). However, although defendants do not

[6]This would be subject only to the considerations articulated in Balciunas v. Duff, 94 Ill. 2d 176, 187-88, 446 N.E.2d 242 (1983), that the assignment of a case to a successor judge be free of impropriety and forum shopping, and that vacature or amendment to the orders entered by the original judge be based upon "careful consideration."

prevail on procedural grounds, they must prevail, for the reasons discussed below, on the substantive merits.

## II.  Substantive Merits

As noted, defendants contend that after the second trial they were entitled to a directed verdict (or judgment notwithstanding the verdict) on the fraudulent misrepresentation count. "[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand." Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967).  The standard of review of an order denying a motion for a directed verdict or a motion for judgment notwithstanding the verdict is *de novo*.  Moss v. Amira, 356 Ill. App. 3d 701, 705, 826 N.E.2d 701 (2005).

To prevail on a claim of fraudulent misrepresentation, the plaintiff must establish the following elements: (1) the defendant made a false statement of material fact, which (2) the defendant knew or believed to be false and (3) made it with intent to induce the plaintiff to act; (4) the plaintiff acted in justifiable reliance on the truth of the statement; and (5) thereby sustained damages.  Connick v. Suzuki Motor Co., 174 Ill. 2d 482, 496, 675 N.E.2d 584 (1996); Board of Education of City of Chicago v. A C & S, Inc., 131 Ill. 2d 428, 452, 546 N.E.2d 580 (1989); Soules v. General Motors Corp., 79 Ill. 2d 282, 286, 402 N.E.2d 599 (1980).  Doe maintains that because of the Dillings' misrepresentations she lost an opportunity to begin treatment when it would have been most effective and life-prolonging.  It bears reiterating that Doe does not claim that because of her reliance on the Dillings' misrepresentations she contracted HIV.  In fact, Doe's

23

own expert opined that she became infected with HIV before she ever met the Dillings. We note

that there is no evidence in the record to the contrary. Indeed, in her brief on appeal Doe

attributes her physical injuries solely to the delay in treating her then-undetected HIV infection.[7]

The principal issue on appeal therefore is whether Doe may recover for irreversible damage to her

immune system that occurred between the time she first met the Dillings and the time she learned

she was HIV-positive.

Since Doe proceeds under the theory of fraudulent misrepresentation, we must first

resolve whether the tort of fraudulent misrepresentation has any viability outside of a commercial

or transactional setting. For the reasons stated below, we hold that the tort of fraudulent

misrepresentation does have application in a noncommercial or a nontransactional setting,

particularly if physical harm is involved. What limits the viability of a cause of action for

fraudulent misrepresentation is not the distinction between an economic and an interpersonal

setting, but rather whether the person alleging misrepresentation was justified in her reliance on

the truthfulness of the statements.

It is true that the tort of fraudulent misrepresentation has its origins in commercial or

transactional settings. See Neurosurgery & Spine Surgery, S.C. v. Goldman, 339 Ill. App. 3d

---

[7]In her brief on appeal, Doe states that her counsel

"carefully segregated out what the case was about (how defendants' lies caused

[her] HIV infection to remain undetected—and thus untreated—and to therefore

progress to full-blown AIDS) from what the case was not about (how Doe

contracted HIV)."

177, 185-86, 790 N.E.2d 925 (2003) (detailing the origins of the tort of fraudulent misrepresentation). Relying on Neurosurgery, defendants contend that fraudulent misrepresentation is only actionable in commercial cases involving pecuniary, but not physical, damages. A thorough review of the applicable law leads us to reject this contention. In Neurosurgery, the Second District stated, in rather categorical terms:

"Simply put, fraudulent misrepresentation has emerged as a tort distinct from the general milieu of negligent and intentional wrongs and applies only to interferences with financial or commercial interests where a party suffers some pecuniary loss." Neurosurgery, 339 Ill. App. 3d at 186.

The court in Neurosurgery added that the theory of fraudulent misrepresentation was unavailable to a plaintiff who suffered physical harm. Neurosurgery, 339 Ill. App. 3d at 186. The court explained its reasoning as follows:

"[F]raudulent misrepresentation is purely an economic tort under which one may recover only monetary damages. McConkey v. AON Corp., 354 N.J. Super. 25, 59, 804 A.2d 572, 593 (2002) (holding that damages in a fraudulent misrepresentation action are limited to those that are pecuniary); Jourdain v. Dineen, 527 A.2d 1304, 1307 (Me. 1987) (holding that pecuniary damages are essential to a fraudulent misrepresentation cause of action).

'Although the invasion of an economic interest by tort or by contract breach will often cause the plaintiff personal distress, the interest ordinarily protected in such cases is purely an economic interest and does not include

25

> interests in personality. Accordingly the usual rule is that the plaintiff must show pecuniary loss in misrepresentation cases and the damages are limited to such pecuniary loss, with no recovery for emotional distress.' D. Dobbs, Remedies §9.2(4), at 559-60 (2d ed. 1993).

> While no court has yet specifically declined to extend fraudulent misrepresentation to noncommercial situations or to damages for physical harm, there is little occasion to depart from the historical trend that our predecessor courts have created because other nominate tort actions have provided adequate remedies. See W. Keeton, Prosser & Keeton on Torts §§ 105 through 110 (5th ed. 1984)."

> Neurosurgery, 339 Ill. App. 3d at 186.

Doe disagrees that the tort of fraudulent misrepresentation is confined to a commercial setting and in support cites to Roe v. Jewish Children's Bureau of Chicago, 339 Ill. App. 3d 119, 790 N.E.2d 882 (2003), and Roe v. Catholic Charities of the Diocese of Springfield, 225 Ill. App. 3d 519, 588 N.E.2d 354 (1992)—both of which held that fraudulent misrepresentation by an adoption agency to prospective parents is actionable. We agree that the Roe cases extended the tort of fraudulent misrepresentation in Illinois to noncommercial transactions. However, although the setting in the Roe cases was definitely noncommercial, it nevertheless embodied elements of a transactional situation in that misrepresentations were made by adoption agencies in connection with placing children for adoption. Here, on the other hand, representations were made by future in-laws to their son's fiancée, *i.e.*, in a strictly interpersonal setting. Another distinction between the instant case and the Roe cases is that the instant case involves physical harm, whereas the Roe

26

No. 1-04-2372

cases do not.

However, as shall be shown below, we believe that an attempt to confine the tort of fraudulent misrepresentation to commercial or, at best, transactional situations is artificial, unwarranted and contrary to the general common-law principles articulated in section 557A of the Restatement (Second) of Torts and followed by many of our sister states. We therefore agree with Doe's contention that the Neurosurgery court erred in stating that physical harm is not compensable under the theory of fraudulent misrepresentation. We further agree with Doe that McConkey and Jourdain, relied upon in Neurosurgery, cannot be cited for the proposition that physical harm is not compensable under the theory of fraudulent misrepresentation. As Doe points out, the plaintiffs in McConkey and Jourdain suffered no physical harm as a result of misrepresentation. See McConkey, 354 N.J. Super. at 33, 804 A.2d at 576 (the plaintiff sought to recover economic and emotional distress damages for fraudulent inducement to leave secure employment for a position threatened by the sale of the company); Jourdain, 527 A.2d at 1305 (the plaintiffs sued their attorney for lying about filing their personal injury action within the statute of limitations, thereby causing them emotional distress). Rather, the pertinent issue in McConkey and Jourdain was whether damages for emotional distress were available. Similarly, section 9.2(4) of the Dobbs treatise relied upon in Neurosurgery addresses the availability of emotional distress damages for fraudulent misrepresentation. D. Dobbs, Remedies §9.2(4), at 559-65 (2d ed. 1993). However, the Dobbs treatise acknowledges that "personal injury can be caused by misrepresentation, concealment or nondisclosure of facts, and when it is, the plaintiff recovers all damages for the physical harm, the pain and suffering and the accompanying

27

emotional distress." D. Dobbs, Remedies §9.2(4), at 561 (2d ed. 1993).

Any doubt as to the availability of recovery for physical injury under the theory of fraudulent misrepresentation is dispelled by section 557A of the Restatement, which provides:

"One who by a fraudulent misrepresentation or nondisclosure of a fact that it is his duty to disclose causes physical harm to the person *** of another who justifiably relies upon the misrepresentation, is subject to liability to the other." Restatement (Second) of Torts §557A (1977).

Comment *a* to section 557A explains:

"The rule here stated permits a tort action of deceit to be maintained, when there is physical harm to person *** who justifiably relies on it. This liability also extends to the economic loss resulting from the physical harm." Restatement (Second) of Torts §557A, Comment *a* at 149(1977).

In reliance on section 557A, among other authority, Maryland's highest court held that an action for wrongful transmission of genital herpes may be stated in terms of fraud, notwithstanding that the misrepresentation did not occur in a business setting. See B.N. v. K.K., 312 Md.135, 538 A.2d 1175 (1988). In the factually analogous case of R.A.P. v. B.J.P., 428 N.W.2d 103 (Minn. App. 1988), the court similarly disagreed with the defendant's contention that only misrepresentations made in business or financial transactions are actionable:

"We find no support for B.J.P.'s assertion that fraud actions may arise only in business or contractual contexts. Although it is true that most fraud claims involve monetary damage resulting from business transactions, it is clear under

28

Minnesota law that fraud claims may also be based on fraudulently-induced

personal injuries. 'The injury to one's person by the fraud of another is quite as

serious as an injury to his pocketbook.' Flaherty v. Till, 119 Minn. 191, 192, 137

N.W. 815, 816 (1912); see also Restatement (Second) of Torts, § 557A

(establishing liability for physical harm caused by fraudulent misrepresentation or

nondisclosure of fact which person had legal duty to disclose)." R.A.P., 428

N.W.2d at 108-09.

Our research uncovered other decisions from our sister states that, albeit not discussing the tort's

historical origins and the perception that the tort is limited to business or financial transactions,

allowed an action for wrongful transmission of a venereal disease to be stated in terms of

fraudulent misrepresentation. See Berner v. Caldwell, 543 So.2d 686 (Ala. 1989), *overruled on

other grounds*, Ex parte General Motors Corp., 769 So.2d 903 (Ala. 1999); Maharam v.

Maharam, 123 A.D.2d 165, 510 N.Y.S.2d 104 (1986); S.A.V. v. K.G.V., 708 S.W.2d 651 (Mo.

1986); Kathleen K. v. Robert B., 150 Cal. App. 3d 992, 198 Cal. Rptr. 273 (1984); De Vall v.

Strunk, 96 S.W.2d 245 (Tex. Civ. App. 1936).

Lastly, we find our supreme court's discussion in A C & S of a related issue of negligent

misrepresentation to be instructive. In A C & S, the supreme court was presented with the

question of whether a plaintiff alleging physical injury may recover for negligent misrepresentation

from the defendants who were involved in the manufacturing and distribution of asbestos-

containing materials, but were not in the business of supplying information for the guidance of

29

others.[8] The supreme court turned to section 311 of the Restatement (Second) of Torts, which provides that one who negligently gives false information to another may be liable for physical harm caused by actions taken in justifiable reliance on the misrepresentation. The court further stated that, in the context of negligent misrepresentation, the scope of the tort is broader where physical injury is involved than where only pecuniary loss is suffered. The supreme court therefore held that one has a duty "not to be negligent in supplying information when reliance on such information might result in physical injury." A C & S, 131 Ill. 2d at 456. By the same token where, as here, the misrepresentation is intentional, as opposed to merely negligent, recovery is not limited to pecuniary loss, but extends to physical injury.

We are not unmindful that the cases we have referred to from other jurisdictions all involved fraudulent misrepresentation on the part of the individual who infected his intimate partner. While in the instant case Doe's fraudulent misrepresentation claim is directed not against her fiancé, Albert, who infected her with HIV,[9] but against his parents, the Restatement does not make any such distinction, and neither do the cases we have cited from other jurisdictions, although they happened to be actions against the individual who infected his intimate partner.

_____

[8]The defendants in that case argued that recovery was precluded under the Moorman doctrine.

[9]Albert's conduct, under Illinois law, was also criminal. See 720 ILCS 5/12-16.2 (West 1996) (it is a crime for knowing carriers of HIV to "engage[] in intimate conduct with another" unless the other person consented, with knowledge of both the carrier's HIV-positive status and the risk of transmission of HIV through intimate conduct).

Conceptually, under either scenario, misrepresentations must be viewed in terms of the elements comprising the tort of fraudulent misrepresentation, which make no such distinction.

However, in expanding the application of the tort of fraudulent misrepresentation to noncommercial situations, as well as to third parties who are not directly involved in the infliction of the injury, particularized scrutiny must be given to the elements comprising the tort, especially the element of justifiable reliance. See, *e.g.*, Teamsters Local 282 Pension Trust Fund v. Angelos, 649 F. Supp. 1242, 1246 (N.D. Ill. 1986) ("Defendants address only one of the elements—justifiable reliance. But because each element is a sine qua non for [plaintiff] to prevail in this action, defendants' successful attack on that single issue dooms [plaintiff's] claim"). Judge Posner, rather bluntly, cast the requirement of justifiable reliance in the following terms:

"If the victim acted recklessly in the face of the alleged fraud, it is difficult to believe that he was actually deceived; he may simply regret having assumed a risk that has turned out badly. The requirement of justifiable reliance backstops the jury's determination of actual reliance. It is on this theory that a person who plays ostrich may be held to have acted deliberately: to know, and to want not to know because one suspects, may be, if not the same state of mind, the same degree of fault." Ampat/Midwest, Inc. v. Illinois Tool Works Inc., 896 F.2d 1035, 1042 (7th Cir. 1990).

More specifically, our supreme court stated that the question of the plaintiff's right to rely on the defendant's representations is one of

"whether, under all the circumstances, plaintiff had a right to rely on the false

representations. This question is to be answered while viewing the representation in light of all the facts of which plaintiff had actual knowledge as well as those of which he 'might have availed himself by the exercise of ordinary prudence.' Schmidt v. Landfield (1960), 20 Ill. 2d 89, 94, [169 N.E.2d 229, 232;] quoting Dillman v. Nadlehoffer (1886), 119 Ill. 567, 577 [7 N.E. 88]. See also Bundesen v. Lewis (1938), 368 Ill. 623, 632-37 [15 N.E.2d 520]." Soules, 79 Ill. 2d at 286-87.

In Bundesen, our supreme court expounded on this point as follows:

" 'If it appears that there were facts and circumstances present at the time the false representations were made sufficient to put the injured party upon his guard or to cast suspicion upon their truth, and he neglected to avail himself of the warning thus given, he will not afterwards be heard to complain, for the reason that his own conduct contributed to his injury. *** A person in possession of his mental faculties is not justified in relying upon representations made when he has ample opportunity to ascertain the truth of the representations before he acts. *When he is offered the opportunity of knowing the truth of the representations, he is chargeable with knowledge. If he does not avail himself of the means of knowledge open to him, he cannot be heard to say he was deceived by the misrepresentations.* (Dickinson v. Dickinson, 305 Ill. 521 [137 N. E. 468]; Hustad v. Cerny, [321 Ill. 354, 151 N. E. 871].) *It is only in cases where the parties do not have equal* knowledge or *means of knowledge of the facts represented that equity will afford relief on the ground of fraud and misrepresentation.* Johnson v.

<u>Miller</u>, 299 Ill. 276 [132 N. E. 490].' " (Emphasis added.) <u>Bundesen</u>, 368 Ill. at 633, quoting <u>Morel v. Masalski</u>, 333 Ill. 41, 46-47, 164 N.E. 205 (1928).

Accord <u>Central States Joint Board v. Continental Assurance Co.</u>, 117 Ill. App. 3d 600, 606-07, 453 N.E.2d 932 (1983).

These requirements have never been relaxed in Illinois. In a more recent decision in <u>Gerill Corp. v. Jack L. Hargrove Builders, Inc.</u>, 128 Ill. 2d 179, 195, 538 N.E.2d 530 (1989), the supreme court, citing to <u>Bundesen</u>, 368 Ill. At 633, stated:

"[O]ne is justified in relying upon the representations of another, without

independent investigation, where the person to whom the representations are made

does not have the same ability to discover the truth as the person making the

representations."

Similarly, in <u>Neptuno Treuhand-und Verwaltungsgesellschaft MBH v. Arbor</u>, 295 Ill. App. 3d 567, 575, 692 N.E.2d 812 (1998), we stated:

"In determining whether there was justifiable reliance, it is necessary to consider all

of the facts within a plaintiff's actual knowledge as well as those that he could have

discovered by the exercise of ordinary prudence. <u>Marino v. United Bank of</u>

<u>Illinois, N.A.</u>, 137 Ill. App. 3d 523, 527 [484 N.E.2d 935] (1985), citing <u>Soules v.</u>

<u>General Motors Corp.</u>, 79 Ill. 2d 282, 286 [402 N.E.2d 599] (1980). If ample

opportunity existed to discover the truth, then reliance is not justified. <u>Central</u>

<u>States Joint Board v. Continental Assurance Co.</u>, 117 Ill. App. 3d 600, 607 [453

N.E.2d 932] (1983). ***

33

'A plaintiff has a duty to investigate further when the circumstances "reasonably require, as a matter of prudence, that an investigation be undertaken." [Citation.] *** "In short, the crucial question is whether the plaintiffs' conduct was unreasonable under the circumstances and ' "in light of the information open to him, that the law may properly say that this loss is his own responsibility." ' " [Citation.]' West v. Western Casualty & Surety Co., 846 F.2d 387, 394 (7th Cir.1988)."

The question of whether a plaintiff's reliance was reasonable should generally be decided by the trier of fact; however, where it is apparent from the undisputed facts that only one conclusion can be drawn, the question becomes one for the court. Neptuno, 295 Ill. App. 3d at 575.

While there have been decisions which have held that the question of justifiable reliance is one of fact for the trier of fact, and not for the judge as a matter of law (*See e.g.*, Sims v. Tezak, 296 Ill. App. 3d 503, 694 N. E. 2d 1015 (1st Dist. 1998); Schrager v. North Community Bank, 328 Ill. App. 3d 696, 767 N. E. 2d 376 (1st Dist. 2002)), these could not purport, to contravene or pre-empt the right to direct a verdict, or by the same token, to grant summary judgment where the overwhelming balance of the evidence would so require (See Pedrick v. Peoria & Eastern R. R. Co., 37 Ill. 2d 494, 510, 229 N. E. 2d 504, 513-14 (1967); Fooden v. Board of Governors of State Colleges & Universities, 48 Ill. 2d 580, 587, 272 N. E. 2d 497, 500 (1971); Winnetka Bank v. Mandas, 202 Ill. App 3d 373, 559 N. E. 2d 961 (1990) ("Appellate court decisions, following Fooden, have adopted the directed verdict standard as the proper test for courts to use in resolving summary judgment motions")).

Such latitude is particularly necessary where, as here, the right of recovery for fraudulent misrepresentation is applied as a matter of first impression in a non-commercial and non-transactional context against a party who is not the actual source of the resultant physical harm, but who may have led to the physical harm solely by virtue of the misrepresentation alone. As discussed, there is little reason to categorically insulate anyone from liability for causing physical harm through reliance upon a deliberate misrepresentation, even where they are not otherwise the cause or source of the harm. However, since the extension of this tort would now expose anyone whatsoever to liability for physical harm caused by reliance upon their misdirection, no matter how disconnected they may otherwise be from the person to whom their misrepresentation was made, the test as to whether such reliance was reasonable or justified should by no means be entirely left to the trier of fact without ever permitting the judge to intervene as a matter of law in determining whether the reliance is justified or reasonable.

We reiterate that Doe's action is for the delay in treatment of her HIV infection. Such situation presents a question of whether a person, such as Doe, who has reason to suspect that she has been infected with HIV, should be allowed to satisfy that inquiry by asking a layperson, whoever that may be, when she herself has an opportunity to consult with a physician or obtain anonymous HIV testing.[10] Under the foregoing authority, the answer to this question is in the negative—as the confluence of the duty to investigate together with the means to ascertain the

---

[10]We note that Doe could have easily obtained anonymous HIV testing without undue health risks or financial burden. See http://www.idph.state.il.us/aids/materials/counseling.pdf (Illinois Department of Public Health website providing information on anonymous HIV testing).

truth makes reliance unreasonable. When the courts speak of the duty to investigate, or inquiry notice, they speak in terms of "notice enough to excite the attention of a prudent man and put him on his guard," and that "every unusual circumstance is a ground of suspicion and demands investigation." Smith v. Grubb, 402 Ill. 451, 464-65, 84 N.E.2d 421 (1949).

In determining the reasonableness of Doe's reliance on the Dillings' representations, we must first take note that Doe introduced insufficient evidence to establish that the Dillings knew prior to November of 1998 that Albert was HIV-positive. Although the Dillings' former son-in-law, Walgreen, testified that "[a]pproximately a year before [Albert] passed away," meaning in November of 1998,[11] Betty mentioned that Albert had AIDS, there is insufficient evidence from which the jury could have legitimately inferred that the Dillings knew before that time that Albert was HIV-positive. Doe introduced no evidence that, aside from Drs. Keller and Cornfield, both of whom treated Albert for genital warts, any other doctor who was in communication with the Dillings knew Albert was HIV-positive. Although Kirk admitted that he knew Albert had genital warts, and Betty testified that Kirk conferred with Albert's doctors from time to time and would occasionally receive and review the doctors' records and reports and share what he had learned with her, there is no evidence that the records and reports Kirk received indicated Albert's HIV status. Nor is there any evidence that Albert ever authorized any of his doctors to discuss his HIV infection with his parents. In this regard, we note that Dr. Cornfield never stated that he discussed Albert's condition with Kirk. In fact, Dr. Cornfield indicated that he did not personally know Kirk. Similarly, although Betty testified that Kirk communicated with Dr. Keller after

---

[11]As noted, Albert died in November of 1999.

Albert's treatment, there is no evidence that they ever discussed anything other than Albert's genital warts. Dr. Keller may have shed light on whether Albert's HIV status was mentioned in those communications. However, he was apparently never deposed[12] and did not testify at trial. On this record, a conclusion that Kirk and Betty were aware of Albert's HIV diagnosis prior to November of 1998 would be a product of speculation and conjecture and, therefore, not sustainable. See United States v. Hochman, 277 F.2d 631, 634 (7th Cir. 1960) ("It is well settled that jury verdicts cannot be based on surmise and speculation; that conjecture and suspicion cannot take over where proof fails; and that verdicts based upon such nebulous grounds cannot be permitted to stand"); accord People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van, 177 Ill. 2d 314, 345, 685 N.E.2d 1370 (1997) (Heiple, J., concurring in part and dissenting in part) ("We instruct our juries that their verdicts must be based upon the evidence and not upon speculation, guess, or conjecture ***. Courts of review should do no less"); Hernandez v. Chicago Park District, 274 Ill. App. 3d 970, 975, 654 N.E.2d 463 (1995) ("a jury's verdict may not be based on speculation, it must be based on the evidence"). Thus, the earliest time when knowledge of Albert's HIV-positive status could be attributed to the Dillings would be, according to the testimony of Walgreen, in November of 1998.

It is clear, however, that by November of 1998 Doe, who by then had been in a close and intimate relationship with Albert for over two years, indisputably would have been on sufficient notice to suspect that she may have been infected with HIV. Doe knew that Albert's condition was steadily declining. In October of 1998, Albert, who was in his mid-40s and appeared to be in

---

[12]The record on appeal does not contain a deposition of Dr. Keller.

good health only two years earlier, had a stroke and was taken by an ambulance to a hospital. When at Christmastime of 1998 Doe and Albert visited with Doe's mother in Michigan, Albert had such severe abdominal pain that Doe and her mother took him to a local emergency room. After returning from Michigan in late December of 1998 or early January of 1999, Doe told Betty about Albert's other symptoms, including that after Albert had recently gone to the bathroom, the toilet bowl was full of blood. When Betty suggested that Albert was suffering from food poisoning, it was Doe, according to her own testimony, who insisted that Albert was more seriously ill, stating, "if I didn't know better I would say he looked almost like a man who has AIDS. Could he have AIDS?" Since Doe was concerned that Albert had AIDS, it would have been utterly unreasonable for her not to be concerned about her own HIV status.

In point of fact, however, Doe's suspicions about the true nature of Albert's condition should have started to germinate much earlier. Doe testified that, prior to first engaging in unprotected sex with Albert, she noticed unusual pigmentation on his penis. Doe admitted that she was "very aware" of sexually transmissible diseases (STDs) and that HIV is an STD. Shortly after having had unprotected sex with Albert, Doe developed a flu-like illness in September of 1996. Dr. Till testified that the flu-like illness was an indication of Doe having been infected with HIV. In the course of the six months following her own flu-like illness, Doe saw Albert lose weight and look worn out and tired. Doe was also aware that Albert was seeing a doctor for "heavy-metal poisoning." A prudent adult in a new relationship who is aware of STDs would be concerned under such unfortunate circumstances about having been infected with HIV.

Doe first began to question the Dillings about Albert's condition shortly after meeting

38

them in mid-May of 1997. Doe's repeated inquiries of the Dillings, when she could have asked Albert for the same information, indicate that she suspected that Albert was not being truthful with her. Doe's inquiries also suggest that, in asking about Albert's condition, Doe was indirectly inquiring about her own, since she had been intimate with Albert and had reason to be concerned about having contracted HIV. Under these circumstances, Doe should have realized that the trustworthiness of the Dillings was questionable. One cannot truly expect her fiance's parents to reveal a secret that their son would not.

Once we determine that Doe should have been on notice of her own condition, as a matter of law, it becomes clear that she should have directed any concerns about having been infected with HIV to a health professional, rather than repeatedly seeking assurances from the Dillings that Albert's only problem was heavy-metal poisoning. While such information about Albert could not have been forthcoming from a health professional because of statutory prohibitions (see, *e.g.*, AIDS Confidentiality Act (the Confidentiality Act) (410 ILCS 305/1 *et seq.* (West 1996))), which we will discuss below, no such impediment existed with respect to any disclosure to Doe of her own condition. We emphasize that Doe contracted HIV in late summer of 1996 and would most likely have tested positive by spring of 1997, *i.e.*, before she first met the Dillings in mid-May of 1997. This was the uncontroverted testimony of Doe's own expert, Dr. Till, which the jury was not free to disregard. See Morus v. Kapusta, 339 Ill. App. 3d 483, 492, 791 N.E.2d 147 (2003), quoting Piano v. Davison, 157 Ill. App. 3d 649, 675, 510 N.E.2d 1066 (1987) ("while a jury is free to disregard an expert's opinion or conclusion of fact on the basis of credibility considerations, it cannot disregard expert testimony when this testimony pertains to medical

issues 'beyond the understanding of a layperson' ").  Therefore, as early as mid-May of 1997, Doe already had an independent means to learn that she had been infected with HIV.  Since HIV testing was readily available to Doe at all relevant times, it was unreasonable for her to look to the Dillings for second-hand information about Albert's health to try to extrapolate her own HIV status from their answers.[13]  Accordingly, the jury's verdict finding defendants liable for fraudulent misrepresentation cannot stand.

We note that the Council would have us predicate our decision upon the proscriptions of the Confidentiality Act, which provides, in pertinent part, that with the exception of health care providers or public health representatives:

"No person may disclose or be compelled to disclose the identity of any person upon whom [an HIV] test is performed, or the results of such a test in a manner which permits identification of the subject of the test ***."  410 ILCS 305/9 (West 1996).

The Council further cites to the provision of the Confidentiality Act prohibiting redisclosure of the results of an HIV test (410 ILCS 305/10 (West 1996) ("No person to whom the results of a test

_____

[13]As defendants point out, Doe's situation was very different from that of the prospective adoptive parents in the Roe cases, whose only legitimate source of information about the children was the adoption agency, as that entity (the adoption agency) was in the business of facilitating adoptions and had both the knowledge of the children's health and the ability to accurately communicate that information to prospective parents.  See Jewish Children's Bureau, 339 Ill. App. 3d at 123; Catholic Charities, 225 Ill. App. 3d at 523.

have been disclosed may disclose the test results to another person except as authorized by Section 9")) for the proposition that the Act's proscriptions apply to a person's HIV status, not just to the laboratory test results. The Council therefore asserts that had the Dillings disclosed Albert's HIV-positive status to Doe, they would have violated the Confidentiality Act.

Doe responds that while the Confidentiality Act may proscribe disclosure of such information, it cannot be construed to sanction outright misrepresentation. The Council, on the other hand, asserts that asking parents about their child's HIV status puts them in the unenviable position of having to choose between providing accurate information, in violation of the Confidentiality Act, remaining silent, or deflecting the question by invoking the Confidentiality Act. To illustrate its point, the Council quotes the following passage from the Seventh Circuit's decision in Flamm v. Eberstadt, 814 F.2d 1169, 1178 (7th Cir. 1987):

"a demand *** to confirm or deny a rumor may flush out the truth no matter what the [respondent] says, even though the [respondent] is entitled to be silent ***. *** If the [respondent] says yes ***, the cat is out of the bag; *** if the [respondent] says 'no comment' that is the same thing as saying 'yes.' "

We do not dispute that questions regarding an adult son's HIV status would put parents in an untenable position. Still, Doe's argument that the Confidentiality Act should not operate as a shield to permit family members and friends of an HIV-positive person to outright deny the person's HIV-positive status is also not without merit. However, since we have already predicated our decision on the failure to satisfy the reasonable reliance element of the tort of fraudulent misrepresentation, we are not called upon to fully resolve the scope of the

proscriptions of the Confidentiality Act, other than to acknowledge the difficulty in acquiescing to the Council's position which would encourage, if not compel, outright misrepresentation in order to avoid the implicit disclosure that mere silence would engender.

With regard to Doe's cross-appeal, we similarly conclude that Judge Levin properly directed a verdict in defendants' favor.

> "Negligent misrepresentation has essentially the same elements [as fraudulent misrepresentation], except that the defendant's mental state is different.  The defendant need not know that the statement is false.  His own carelessness or negligence in ascertaining its truth will suffice for a cause of action. [Citation.] For negligent misrepresentation, a plaintiff must also allege that the defendant owes a duty to the plaintiff to communicate accurate information."  A C & S, 131 Ill. 2d at 452.

Doe's theory of negligent misrepresentation is that the Dillings had voluntarily undertaken a duty to keep her fully informed about Albert's health, and they were negligent in failing to inform her that Albert was HIV-positive.  However, the mere nondisclosure of Albert's HIV status, whether intentional or otherwise, cannot be actionable because of the Confidentiality Act.  If there was to be any liability, it would have to be predicated upon the theory of misrepresentation, rather than nondisclosure.  That aside, the theory of negligent misrepresentation, like the theory of fraudulent misrepresentation, must fail because of Doe's failure to establish that her reliance on the Dillings' representations was reasonable.

## CONCLUSION

42

For the reasons set forth above, we vacate the judgment entered on the jury's verdict finding defendants liable for fraudulent misrepresentation and awarding Doe compensatory damages. We affirm the remainder of the judgment.

Affirmed in part and vacated in part.

McBRIDE, P.J., and CAHILL, J., concur.