Docket No. 104049.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

JANE DOE, Appellant, v. ELIZABETH DILLING, Indiv. and as Ex'r of the Estate of Kirkpatrick Dilling, *et al.*, Appellees.

*Opinion filed April 3, 2008.*

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Fitzgerald, Garman, and Karmeier concurred in the judgment and opinion.

Justice Kilbride specially concurred, with opinion.

Justice Burke took no part in the decision.

## OPINION

Plaintiff, Jane Doe, filed a complaint in the circuit court of Cook County against defendants Elizabeth and Kirkpatrick Dilling, for, *inter alia*, fraudulent and negligent misrepresentation. A jury found for Doe on the fraudulent misrepresentation claim and awarded her $2 million in compensatory damages. The appellate court vacated the judgment entered on the jury's verdict finding defendants liable for fraudulent misrepresentation and awarding Doe compensatory damages. The appellate court affirmed the remainder of the judgment of the circuit court. 371 Ill. App. 3d 151. We granted leave to appeal. 210 Ill. 2d R. 315. For the reasons that follow, we affirm the

judgment of the appellate court, although for reasons different than those expressed by that court.

## BACKGROUND

On May 4, 2000, Doe filed a nine-count complaint in the circuit court of Cook County against the estate of her late fiancé, Albert Dilling (Albert), as well as Albert's parents, Elizabeth (Betty) and Kirkpatrick (Kirk),[1] after Albert had died from acquired immune deficiency syndrome (AIDS). In the course of pretrial proceedings, Doe amended her complaint several times, including dropping Albert's estate as a defendant,[2] and eliminating several of the original counts. By early 2004, Doe filed a fifth amended complaint, which contained two counts directed at Betty and Kirk[3] (collectively, the Dillings), which are at issue in this appeal. Doe alleged that the Dillings had intentionally and falsely stated to her that Albert was not infected with the human immunodeficiency virus (HIV) and/or suffering from AIDS when they knew that, in fact, he was HIV-positive and had AIDS. Doe also alleged a claim of negligent misrepresentation against the Dillings on these same facts. In both instances, Doe alleged that the actions of the Dillings caused her to delay the discovery that she herself was infected with HIV, resulting in physical harm to her as she was unable to obtain timely medical treatment and she now has full-blown AIDS. Doe's case was tried before a jury in spring 2004.[4]

___

[1]Doe also named Kirk's law firm, Dilling & Dilling, as a defendant on the basis that the firm allegedly committed legal malpractice with respect to matters unrelated to Doe contracting HIV. The legal malpractice claim is not at issue in this appeal.

[2]Pretrial discovery had revealed that Albert's estate had no assets and a negative net worth.

[3]The fifth amended complaint reflected the substitution of Kirk's estate as a party defendant due to his intervening death.

[4]Doe's action was originally tried to a jury in April 2003. At that time, the circuit court judge directed a verdict in favor of defendants on plaintiff's fraudulent misrepresentation claim. Thereafter, the jury was unable to reach a verdict on the claim of negligent misrepresentation.

## The Trial

### *Doe's Case in Chief*

Doe testified that she met Albert in April 1996, when she was 44 years old and he was 41. Doe, a college-educated small-business owner, had responded to a personal ad placed by Albert in a free weekly local newspaper. Doe described Albert as looking "healthy" when they first met, and the couple thereafter began to date on a steady basis. Prior to her becoming more intimate with Albert, Doe initiated a discussion with him about sexually transmitted diseases. She informed Albert that she had practiced safe sex in the past, that she had previously had an AIDS test[5] and that she was disease-free. Doe described herself as being "very aware of sexually-transmitted diseases" and concerned that she did "not want to expose [herself] to any." Doe asked Albert if he had anything to tell her on this subject. He answered her questions and she believed his answers.[6]

Doe first kissed Albert in July 1996, and, thereafter, they had sexual intercourse using a condom in late July or early August. When Doe saw Albert naked, she noticed unusual dark-colored pigmentation on his genitalia, and she asked him about it. Albert told her that he had previously suffered from genital warts and that he had them surgically removed by cauterization. Albert explained to her that because he had worked as a landscaper he handled plant and fungal materials that contaminated not only his hands, but also areas of his body that his hands touched. Doe believed Albert's explanation. As Doe and Albert became closer, she decided to pursue her relationship with him with the intention of marrying him and having his child.

---

Accordingly, a mistrial was declared. No appeals were taken from the directed verdict finding.

[5]Doe testified that the AIDS test was performed in 1991 in conjunction with her application for disability insurance.

[6]Because Albert was deceased, Doe generally was not permitted to testify at trial as to what Albert told her, as such statements are generally inadmissible under the Dead Man's Act (735 ILCS 5/8–201 (West 2002)).

With this in mind, the couple had unprotected sexual intercourse in late August 1996.

In September 1996, Doe became ill with flu-like symptoms, a very high fever, and a rash. Because the symptoms quickly resolved, Doe believed it was simply the flu. She therefore did not seek medical treatment and made no connection between these symptoms and her unprotected sexual intercourse with Albert. Doe stated that around this same time, Albert complained about having difficulty walking straight. Albert experienced dizziness and was unstable and not sure-footed.

In the fall of 1996, Albert traveled to Wyoming to purchase a bar/restaurant. Doe and Albert became engaged around the end of 1996, and Doe visited him in Wyoming in early 1997. At that time Doe found Albert looking "a little tired and worn out, thin." She asked him about his appearance and believed whatever he told her. Doe acknowledged that during this visit with Albert, she observed that he had "very dry skin, which was almost ashen looking."

During Doe's stay in Wyoming, Albert invited her to accompany him to Reno, Nevada, where he had an appointment to consult with a doctor about his health condition of heavy-metal poisoning. Doe did not visit the doctor's office with Albert, but Albert gave her a printout of lab test results from a hair analysis that had been previously performed on him, showing that he "had heavy-metals in his system."

In May 1997, Doe met Albert's parents, Kirk and Betty, for the first time, when the Dillings returned to the Chicago area from their winter residence. Kirk and Betty invited Doe and Albert to join them for dinner at their home. According to Doe, the topic of Albert's health came up during this visit. Betty told Doe that Albert had heavy-metal poisoning but that he would get well and that it was Albert's only health problem. Betty also told Doe that she and Kirk were "in charge of [Albert's] medical care," and that Kirk, by virtue of his long career as an attorney handling food and drug cases, "was a medical expert in these matters." In addition, Betty told Doe that she and Kirk were "very concerned about their son's health; that he would

be just fine; that everything would be just fine."[7] Doe believed that the Dillings were concerned about the couple's happiness together.

The subject of Albert's health was "a constant topic of conversation" between Doe and the Dillings throughout 1997 and 1998, both during discussions over the phone and in person. The Dillings repeatedly told Doe that heavy-metal poisoning was Albert's only health ailment, that he was receiving care from the right doctors and that eventually he would get well.

Approximately a week after Doe met the Dillings, Albert had to be taken to the emergency room because he suffered adverse reactions after he had injected himself with ozone.[8] Doe believed Albert had experienced a stroke. On October 27, 1998, Albert was again taken to the emergency room, this time by ambulance. As with his earlier visit to the emergency room, he had again suffered an adverse reaction from an ozone injection. Doe again believed that Albert had suffered a stroke because he was temporarily unable to speak.

At the end of December 1998, Doe and Albert traveled to her mother's home in Michigan. During this visit Albert suffered abdominal distress that was so severe "he was screaming in pain." Doe and her mother took Albert to the local emergency room. Although Albert was treated and released, he was in such severe pain that he was unable to complete the trip home to Chicago in one day, and the couple was forced to stop overnight on the way back.

After Doe and Albert returned to Chicago from Michigan, Doe told Betty about what had happened on the trip, including the fact that Albert had showed Doe a toilet bowl full of blood. At that time Doe was "getting more and more concerned" about Albert's health, and she asked Betty about the heavy-metal poisoning and why Albert was not improving. Betty then asked Doe what Albert had eaten during the Michigan trip, and Doe responded that she had purchased some

---

[7]As was the case with Albert's statements to Doe, because at the time of trial Kirk was deceased, Doe, in most instances, was not allowed to testify with respect to what Kirk told her. However, Kirk's evidence deposition was read to the jury at the second trial.

[8]No explanation was offered at trial as to why Albert had injected himself with ozone and if it was a prescribed medical treatment.

fresh cheese. Betty thought the cheese might have been spoiled, and Doe agreed that "maybe it was, and that it could be food poisoning."

Doe, however, further confided in Betty that she was anxious about the deteriorating state of Albert's health. Doe told Betty that "Albert could be more seriously ill than what you think he has with this heavy-metal poisoning. He appears to be ... if I didn't know better, I would say he almost looked like a man who has AIDS. Could he have AIDS? Is there some ... Could he be really sick? Is there something more wrong with him?" Betty answered Doe in the negative. Doe stated that this conversation occurred within the earshot of Kirk, who participated in it. Doe believed the Dillings' statements.

During 1999 Doe and Betty spoke on the phone at least every other day, and Betty continued to tell Doe that Albert was suffering from heavy-metal poisoning. During these conversations, Kirk would also often be on the speakerphone. Doe believed everything the Dillings told her. Doe cared for the Dillings and felt like she was part of the family. Doe believed that the Dillings also cared for her like a daughter-in-law, even though she and Albert were not yet married.

After Doe and Albert returned from their Michigan trip, and also around Father's Day 1999, Doe suggested to the Dillings that Albert should be evaluated by other physicians. Doe was "getting very discouraged that [Albert] wasn't getting any better" and was "frantic" about his condition. Doe specifically suggested to the Dillings that Albert should go to the Mayo Clinic for an evaluation. Doe had seen the Mayo Clinic on the news and believed that "since [Albert's] problem was so unique *** [the Mayo Clinic] might be a good place to address it." Betty did not agree with Doe's suggestion. However, Doe admitted that the Dillings did not prevent Albert from going to the Mayo Clinic and that the only question was who would pay for the trip and treatment. Albert had no insurance and such a trip and examination would have been extremely expensive.

Albert's health continued to decline throughout 1999. Doe and Albert lived in her apartment for almost a year until his death. During that time, Doe did "everything" for Albert. When Albert could no longer feed, dress or care for himself, Doe assisted him. Doe also financially supported Albert. Albert eventually lost his ability to drive and did not venture outside except for when Doe took him to visit the Dillings on the weekends.

In the summer of 1999, Albert went to see Dr. Hauser, who had been one of Kirk's clients. Doe accompanied Albert on every visit to Dr. Hauser and discussed Albert's condition with him. Dr. Hauser performed tests on Albert and, in June 1999, Dr. Hauser gave Doe a laboratory report, which showed that Albert was suffering from Lyme disease. Doe immediately called Betty and told her, "We finally have a diagnosis. Now we know what's really wrong with Albert." Doe "believed *** the doctor when he said Albert had Lyme disease."

Toward the end of summer 1999, Doe began to notice changes in her own physical condition. She had not paid much attention to her own health prior to this period because she was focused exclusively on Albert and his health concerns. Doe began to get very fatigued. Her hair began to fall out, her gums bled profusely and she had a yeast infection. In addition, her skin started splitting at various points on her body and she developed sores all over. She attributed these changes to the fact that she was a "full-time caretaker and running Albert to the doctor two or three times a week and taking care of [her] business and running around intensively–trying to keep it all together." Between 1994 and 1999 Doe never saw a doctor for any type of medical treatment.

Even though Dr. Hauser diagnosed Albert with Lyme disease and had given him antibiotics, Doe saw no improvement in his condition. Around October 1999, Doe questioned Dr. Hauser about Albert's lack of response and improvement, and he suggested that Albert see a neurologist. Prior to that next appointment, Betty told Doe for the first time that Albert had a blood transfusion in 1979. Doe asked Betty why she was just telling her this now and not earlier. Betty told Doe that she did not know why she never told her. Doe admitted, however, that she had knowledge prior to this statement by Betty that Albert previously had a blood transfusion, but that Doe "doubted that information at that time."

On November 2, 1999, Doe took Albert to see Dr. Waitley, who tested Albert for HIV. Doe admitted that she told Dr. Waitley that she and Albert "had been married for 15 months," even though that was not true and they only remained engaged. Doe was with Albert when Dr. Waitley informed them that Albert was HIV-positive. About one week later, Doe was also tested and discovered that she, too, was HIV-positive. Dr. Waitley told Doe that she could be his patient or

she could get treatment elsewhere, and that she had some time to start treatment. Three weeks later, on November 29, 1999, Albert died of AIDS.

In March 2000, Doe sought treatment for the first time for her own HIV infection. Doe did not commence treatment earlier because she was in "deep despair and anguish and in grief" over what had happened and how the Dillings had treated her. At that point, she saw Dr. Finlayson, a physician who took a more holistic approach to medicine. Doe testified that Dr. Finlayson did not prescribe any medications, such as antiretroviral drugs; instead, he told Doe to take vitamin supplements. Doe saw Dr. Finlayson three more times between March 1, 2000, and February 2001.

In March 2001, Doe started seeing Dr. Michelle Till, who is her current treating physician. Dr. Till is the medical director of the Women's HIV Program at Northwestern Memorial Hospital. In May 2001, Dr. Till started Doe on highly active antiretroviral therapy (HAART). Doe stated that her condition improved once she began the HAART treatment.

As part of her case in chief, Doe presented the videotaped deposition of Kirk Dilling, who had passed away prior to the case going to trial. Kirk had been an attorney for 54 years, and the primary focus of his legal practice was food and drug litigation, a practice for which he became internationally known. During his career, Kirk had represented many doctors, including Dr. Fuller Royal in Nevada, Dr. Helmut Keller, who practiced in Germany, and Dr. Ross Hauser, who practiced in the Chicago area. Kirk had recommended that Albert see all of these doctors for his health ailments at one time or another.

In 1997 Kirk knew of the existence of HIV and AIDS, and also that it was passed from person to person through unprotected sexual intercourse and compromised a person's immune system. Kirk, however, denied that Albert ever had AIDS. Kirk believed that Dr. Waitley had "misdiagnosed" Albert as being HIV-positive and that he "killed [Albert] with drugs that caused his death in less than three weeks."

In 1992, Kirk had recommended that Albert see Dr. Keller in Germany about his genital warts. Dr. Keller, to Kirk's knowledge, specialized in treating patients with cancer and did not treat patients

with HIV. Further, Kirk understood that Dr. Keller's practice included treating his patients with a modality called "Carnivora." Kirk believed that Carnivora was used to treat cancer. Kirk denied that he knew by 1997 that it was used to treat the immune system. Notwithstanding this, Kirk previously stated in a discovery deposition that Carnivora was a remedy thought to benefit the immune system and not to fight cancer. Kirk responded that Carnivora "affects the immune system," but not that it was a "remedy" for it.[9]

When questioned as to why he failed to specifically list Dr. Keller in his answers to interrogatories which asked to identify all physicians who treated Albert from 1992 until the time of Albert's death, Kirk stated that he listed the name of Dr. Keller's clinic and that he had also noted that Albert was treated for genital warts there.

Over the years, Kirk would recommend a specific treatment for Albert if he "knew anything about it." One treatment that Kirk felt "qualified" to recommend to Albert was chelation therapy.[10] Kirk and Betty had paid thousands of dollars for Albert's medical treatment. Kirk acknowledged that Doe had suggested that Albert be evaluated at the Mayo Clinic, but that he and Betty "didn't agree to pay for it."

Kirk admitted telling Doe that Albert was suffering from heavy-metal poisoning and Lyme disease. When asked if he told Doe that Albert was infected with HIV, Kirk stated, "No, because he wasn't." Kirk denied ever telling Doe that Albert had AIDS, "because he didn't [have it]."

The Dillings' former son-in-law, James Walgreen, also testified on Doe's behalf at trial by evidence deposition which was read to the jury. Walgreen was married to the Dillings' daughter, Victoria, for 20 years. He knew Albert, who was Victoria's twin brother. At the time

---

[9]No expert evidence was introduced at trial with respect to the purpose of Carnivora and whether it was a treatment for the immune system.

[10]"Chelation" is "[a] reaction between an organic compound *** and a metal in which a ring type chemical structure is formed," and "can be used to remove a substance from participation in biological reactions," *e.g.*, "the chelation of the calcium iron of blood prevents blood from clotting." 2 J. Schmidt, Attorneys' Dictionary of Medicine and Word Finder C-191 (1997).

of his deposition, Walgreen had been recently divorced from Victoria. During their marriage, Walgreen and Victoria were concerned about Albert's health and they were told that Albert suffered from Lyme disease and lead poisoning.

Walgreen testified to an incident that occurred while he was still married to Victoria that he said took place "approximately a year before [Albert] passed away," meaning in November of 1998. Walgreen and Victoria were visiting the Dillings' home, and Betty told them that Albert had AIDS. This conversation occurred in the sunroom of the Dillings' home. Walgreen noted that "someone should inform [Doe]." He was then told by Kirk and Betty that they had not yet met Doe, and that he "should keep quiet" because it was "none of [his] business."

Counsel for the Dillings extensively questioned Walgreen with respect to his bias against them as a result of his divorce proceedings with their daughter Victoria. Walgreen maintained that his testimony had nothing to do with his divorce. He denied being biased against the Dillings, and he stated that he liked Kirk. Walgreen also admitted that he never passed along the information of Albert's AIDS to Doe, even though he had several opportunities to do so.

Betty Dilling also testified at trial as part of Doe's case in chief as an adverse witness under section 2–1102 of the Code of Civil Procedure (735 ILCS 2–1102 (West 2002)). Betty stated that on occasion Kirk held himself out as an expert in the field of health with respect to certain areas. Betty acknowledged that Kirk did this when they discussed Albert's health with Doe. She, Kirk and Doe had countless conversations about Albert's health, both over the phone and in person. Betty acknowledged that she and Kirk were very involved in Albert's health care and medical treatment, and that sometimes Kirk would confer with Albert's doctors and then share with her what he had learned. Occasionally, Kirk would review the records and reports of the doctors who cared for Albert, although Betty stated that she "didn't understand" that information. Betty also knew that Kirk had arranged for Albert to see Dr. Keller in Germany in 1992 and that Dr. Keller was Kirk's client.

Plaintiff also introduced the evidence deposition of Dr. Joel Cornfield as part of her case in chief, and it was read to the jury at trial. Dr. Cornfield, a urologic surgeon, treated Albert for genital

warts from April 1992 to July 1992. Albert came to see him because his father, Kirk, had been a friend of Dr. Barry, and Dr. Cornfield had taken over Dr. Barry's practice. However, Dr. Cornfield did not personally know Kirk. Albert suffered from a severe case of genital warts, which Dr. Cornfield described as a sexually transmitted disease. Because Albert had a very significant number of these warts, Dr. Cornfield believed the best treatment was to surgically cauterize them. However, Albert never showed up for the scheduled surgical procedure. Dr. Cornfield thereafter spoke to Albert over the phone and it was at that time that Albert informed him that he was HIV-positive.

Dr. Michelle Till, Doe's treating physician, also testified as part of Doe's case in chief via evidence deposition, but was cross-examined by defense counsel live. When Doe first came to her for treatment in March 2001, Doe was asymptomatic. In May 2001 Doe began HAART therapy and her blood tests began to show improvement. Doe's subsequent response to treatment has been "fair."

In Dr. Till's medical opinion, the delay from spring 1997 to November 1999 of Doe learning of her HIV exposure caused irreversible damage to her immune system. Dr. Till explained that an individual's "T cells" are types of white blood cells used by the body to fight off infections and malignancies. HIV infects T cells and begins to kill them, eventually causing the cell count to drop to a level where the body cannot fight off infections. AIDS occurs when the T-cell count is either below 200 or opportunistic infections develop.

In Dr. Till's medical opinion, Doe became infected with HIV in late summer 1996 when she had unprotected sexual intercourse with Albert. Doe experienced flu-like symptoms in September 1996 that were consistent with an acute HIV infection–an illness which develops shortly after someone is infected with the virus. Doe is a "rapid progressor," meaning that she is one in whom the virus reproduces rapidly. This, in turn, causes a patient to more quickly progress from an HIV infection to full-blown AIDS. As a result, such patients are in need of faster and earlier treatment to prevent this progression. When Doe first came to Dr. Till for treatment in March 2001, Doe had a T-cell count of 129, which signified that she had already progressed to AIDS. A "rapid progressor" such as Doe should

-11-

have been under HAART therapy before her T cells declined under 200.

According to Dr. Till, the "vast majority" of individuals who are exposed to HIV seroconvert within six months of the exposure, with some taking "a couple of weeks," and others "a few months." "Seroconversion" means "the point at which the person who is infected develops antibodies against the HIV virus, and that can be detected by a [positive HIV] blood test." Dr. Till surmised that Doe "most likely" would have seroconverted by spring 1997. Data suggests that treating someone "within six months of seroconversion may help preserve the specific immune response to HIV that is lost thereafter."

Dr. Till believed that Doe's delay in discovering her HIV infection between spring 1997 and November 1999 damaged her immune system and led to more advanced HIV disease. Treatment in spring 1997 would have been significant because it would have been within six months of Doe's seroconversion and, therefore, "[s]he would not have continued to lose T cells and progress to AIDS." People who begin therapy at lower T-cell counts do not respond as well to therapy as do those who are treated with a more moderate T-cell count. Dr. Till believed Doe could "have been helped" if her disease had been detected by spring 1997. Doe, however, suffered little harm from the delay in starting treatment from the date she tested positive for HIV on November 9, 1999, until the time that she started HAART treatment in May 2001.

Dr. John McGillen also testified on plaintiff's behalf in her case in chief at trial via evidence deposition and in person. Dr. McGillen was an expert originally hired by defendants and thereafter called to testify by Doe as her expert. Dr. McGillen was in private practice and was board certified in internal medicine and infectious diseases. Over the years, he had treated several patients infected with HIV, but stated that, on average, only 1% of his patients were HIV-positive.

In the course of examining Albert's medical records, Dr. McGillen observed the results of a blood test performed on Albert by Dr. Keller in 1992. Based upon the test results, Albert was infected with HIV as of December 1992. Further, based upon the medical records, Dr. McGillen concluded that Albert did not have heavy-metal poisoning or Lyme disease. In light of all of the information available

-12-

to him, Dr. McGillen opined that it was likely that Doe was infected with HIV by Albert, and that the flu-like symptoms she experienced in September 1996 constituted an episode of acute HIV infection.

Dr. McGillen noted that it is of benefit to treat someone who has a newly acquired HIV infection very aggressively because only a very small window of opportunity exists to do so. He explained that the optimum period for treatment is "within two weeks of the onset of the acute viral infection," and that the treatment period could be closed by two months after the infection.

When asked whether there would be benefit in starting therapy nine months after the infection, as Doe alleged in her suit, Dr. McGillen replied, "No, there is no benefit at all. Potentially it is somewhat hazardous." When asked whether the delay of 2½ years in diagnosing Doe's HIV condition affected the outcome for the treatment of Doe's condition, Dr. McGillen answered that such a delay "had no effect at all on her prognosis or survival rates. None whatsoever." The reason for this was because "there is no clear correlation *** that early treatment other than in that little couple-month window improves the survival with the illness. *** And I just don't believe that there is any evidence at all that her prognosis would be otherwise altered by a delay of a period of time like that."

*The Dillings' Case*

After Doe rested her case, the Dillings presented evidence and witnesses on their own behalf. Betty testified that she did not know that Albert had HIV until after his diagnosis by Dr. Waitley in November 1999 when Doe called her and told her the news. Betty was "devastated." By summer 1999, Kirk had experienced two strokes and Betty had acted as his nurse during that period. Betty had offered to care for Albert in her home, but Doe refused the offer because Doe wanted to care for Albert herself.

From 1996 through mid-1999, all Betty knew about Albert's health was that he had heavy-metal poisoning. Then, in mid-1999, Betty was told that Albert had been diagnosed with Lyme disease. Betty acknowledged telling Doe that Albert would get better. When Doe suggested that Albert go to the Mayo Clinic, Betty said no because Betty trusted the doctors that Albert was seeing. Further,

Albert had no health insurance and Betty thought it would be "prohibitively expensive."

Betty denied that after Albert and Doe returned from Michigan Doe asked her if Albert had AIDS. Doe told Betty about Albert's illness and having to take him to the emergency room. Doe never raised with her the topic of AIDS prior to Albert's diagnosis in November 1999.

Betty denied that the conversation that Walgreen had testified to ever took place. Although Walgreen maintained that the conversation occurred in the sun room, that room is unheated and would not have been used in November, the time he said the discussion occurred. In addition, Kirk was using a walker at that time and it would have been "with great difficulty" that he would have been in that room because he would have had to go down a step. At that time Kirk had been "uneasy and afraid of thresholds and steps."

Victoria Dilling's evidence deposition was also read to the jury as part of the Dillings' case. Victoria denied that the conversation testified to by Walgreen took place. Her parents never had conversations in the sunroom of their home, as it was not a comfortable room and they would only use it occasionally at the times they wanted to go outside. Victoria stated that Kirk was afraid to go down the stairs in his wheelchair, which was necessary to get to the sunroom. In addition, the sunroom was not heated, so it was not used in the winter. In the 20 years that she and Walgreen were married, they never had any conversation with her parents about sex. Further, the divorce proceedings between her and Walgreen were "extremely difficult." Victoria was unaware that her brother Albert had AIDS prior to his diagnosis by Dr. Waitley in November 1999.

Dr. Finlayson also testified at trial on behalf of defendants. Doe first came to see him for treatment on March 2, 2000. At that time she was HIV-positive but asymptomatic. Dr. Finlayson, a family practitioner, performed a series of diagnostic tests on Doe. He found Doe to be a "rapid progressor" with respect to the disease, and he opined that if Doe would have started treatment earlier after being infected, it would have "been the most optimal at that point."

At the close of all the evidence, the Dillings moved for a directed verdict on both the fraudulent- and the negligent-misrepresentation

counts. The circuit court entered a directed verdict for defendants on the negligent-misrepresentation count. The circuit court also entered a directed verdict for the Dillings on Doe's claim for punitive damages with respect to the fraudulent-misrepresentation count. The circuit court thereafter allowed the fraudulent-misrepresentation count to go to the jury, which subsequently returned a verdict in favor of Doe and against the Dillings on the fraudulent-misrepresentation count. The jury awarded Doe $2 million in compensatory damages. The circuit court thereafter entered judgment on the verdict, and denied the parties' posttrial motions.

*The Decision of the Appellate Court*

The appellate court affirmed in part and vacated in part the judgment of the circuit court. 371 Ill. App. 3d 151. The court vacated that part of the circuit court judgment in favor of Doe which found the Dillings liable for fraudulent misrepresentation. Although the court found that the tort of fraudulent misrepresentation has application outside of a commercial or a transactional setting–particularly if physical harm is involved–the court determined that Doe had failed to meet her burden of establishing that her reliance upon the allegedly fraudulent statements made by the Dillings was justified. The court then affirmed the remainder of the judgment of the circuit court, holding that the circuit court properly directed a verdict in favor of the Dillings on the negligent-misrepresentation count, as Doe had failed to satisfy the elements of that cause of action.

This court allowed plaintiff's petition for leave to appeal. 210 Ill. 2d R. 315. We also allowed the AIDS Legal Council of Chicago to file a brief as *amicus curiae*.


ANALYSIS

Doe maintains that she presented sufficient evidence at trial to establish her claim of fraudulent misrepresentation against the Dillings, and that the appellate court therefore improperly vacated the jury verdict and judgment in her favor on that claim. The Dillings respond, however, that our analysis must necessarily begin with the threshold issue of whether the appellate court properly extended the

-15-

cause of action for fraudulent misrepresentation beyond its traditional application in commercial and transactional settings to the facts presented in the matter at bar, where plaintiff seeks to hold the Dillings liable for their alleged failure to disclose and their misrepresentation of the HIV status of their adult child. *Amicus* AIDS Legal Council of Chicago (Legal Council) agrees with the position taken by the Dillings on this issue.

In order for a plaintiff to prevail on a claim of fraudulent misrepresentation, he or she must establish the following elements: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance. *Connick v. Suzuki Motors Co.*, 174 Ill. 2d 482, 496 (1996); *Board of Education of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 452 (1989); *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 114 Ill. 2d 278, 288 (1986); *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286 (1980); see generally W. Keeton, Prosser & Keeton on Torts §105, at 725 (5th ed. 1984). "In addition, the reliance upon the misrepresentation must have been justified, *i.e.*, the other party had a right to rely upon the statement." *Charles Hester Enterprises, Inc.*, 114 Ill. 2d at 288; *Soules*, 79 Ill. 2d at 286; *Schmidt v. Landfield*, 20 Ill. 2d 89, 94 (1960).

The history and origin of the tort of fraudulent misrepresentation lies in the common law action of deceit, a very narrow tort that applied only to cases involving business or financial transactions between parties. See W. Keeton, Prosser & Keeton on Torts §105, at 726 (5th ed. 1984). As the United States Supreme Court has explained:

> "[M]any familiar forms of *** conduct may be said to involve an element of 'misrepresentation,' in the generic sense of that word, but 'so far as misrepresentation has been treated as giving rise in and of itself to a distinct cause of action in tort, it has been identified with the common law action of deceit,' and has been confined 'very largely to the invasion of interests of a financial or commercial character, in the course of business dealings.' " *United States v. Neustadt*, 366 U.S. 696, 711 n.26, 6 L. Ed. 2d 614, 624 n.26, 81 S. Ct. 1294,

1302 n.26 (1961), quoting W. Prosser, Torts §85, at 702-03 (1941).

In light of the origin of this cause of action, it is not surprising that the tort of fraudulent misrepresentation has been historically treated as purely an economic tort under which one may only recover damages for pecuniary harm. See W. Keeton, Prosser & Keeton on Torts §105, at 726 (5th ed. 1984) (the application of the tort of fraudulent misrepresentation has been limited to remedying harm of a commercial or financial nature); Restatement (Second) of Torts, Scope Note, at 54 (1977) (the tort of fraudulent misrepresentation has traditionally been associated with liability for pecuniary loss); Restatement (Second) of Torts §531, at 66 (1977) (setting forth the "General Rule" for fraudulent-misrepresentation actions and defining damages solely in terms of pecuniary loss). The historic limitations on the application of this tort are "in part connected with the fact that in the great majority of the cases which have come before the courts the misrepresentations have been made in the course of a bargaining transaction between the parties," and, as a consequence, "the action has been colored to a considerable extent by the ethics of bargaining between distrustful adversaries *** in the course of business dealings." W. Keeton, Prosser & Keeton on Torts §105, at 726 (5th ed. 1984).

Although fraudulent misrepresentation has been traditionally considered "a stand-alone economic or commercial tort that causes financial harm without causing physical harm either to person or to property" (2 D. Dobbs, Torts §469, at 1344 (2001)) and, therefore, has generally been confined to remedying losses of a commercial or financial character, there have been limited occasions where this cause of action has been held to lie for personal injuries. W. Keeton, Prosser & Keeton on Torts §105, at 726 (5th ed. 1984). "In general, however, other theories of action have been sufficient to deal with non-pecuniary damage *** [where] the somewhat narrower theory of deceit is not called into question." W. Keeton, Prosser & Keeton on Torts §105, at 726 (5th ed. 1984). In other words, if the tort of fraudulent misrepresentation is not recognized for a certain fact pattern, this does not necessarily mean that a plaintiff is left without a remedy for his or her injuries, as other tort actions may be available. See *Neurosurgery & Spine Surgery, S.C. v. Goldman*, 339 Ill. App.

3d 177, 184-85 (2003) (providing examples of other possible tort actions for misrepresentation); see also Restatement (Second) of Torts, Scope Note, at 54 (1977) (same).

In the matter at bar, the Dillings contend that there is no sound reason for departing from this historical trend wherein the application of the tort of fraudulent misrepresentation has been generally limited to commercial and business settings in which the aggrieved party suffers a pecuniary loss. They underscore that, in a business setting, the parties to the transaction have a recognized duty to disclose information fully and accurately, and that such a duty is inherent not only in the nature of commercial dealings, but also within the legal relationships that exist between the parties in such a setting. The Dillings maintain that it is this inherent duty to deal honestly within business transactions that animates the tort of fraudulent misrepresentation and which runs throughout all of the sections of the Restatement that deal with this cause of action.

The Dillings further assert that, in contrast, no such inherent duty to disclose exists within the purely private encounter that is at issue in the instant cause. The Dillings therefore contend that extending the tort of fraudulent misrepresentation from its traditional commercial setting to the facts presented in the matter at bar would have the potential for dire consequences, in that, unlike in the case of commercial transactions where the parties' duty to deal honestly is circumscribed by the scope of the business dealings, in purely personal settings such a duty would be without limits.

As stated, *amicus* Legal Council supports the position taken by the Dillings on this issue and likewise argues that the tort of fraudulent misrepresentation should not be expanded to apply to the facts presented in this case. *Amicus* underscores that allowing civil liability based upon a common law cause of action for allegedly fraudulent misrepresentation of another person's HIV status would be at odds with the provisions of the Confidentiality Act, which guarantee the confidentiality of a person's HIV status. 410 ILCS 305/9 (West 2002). Thus, the Legal Council notes, under the

Confidentiality Act, the Dillings had a statutory legal duty to maintain confidentiality if they knew anything about Albert's HIV status.[11]

In response, Doe points to the opinion of the appellate court below, and notes, as did that court, that two prior Illinois decisions have previously recognized the tort of fraudulent misrepresentation in seemingly noncommercial settings. Based upon the appellate court's rulings in *Roe v. Jewish Children's Bureau of Chicago*, 339 Ill. App. 3d 119 (2003), and *Roe v. Catholic Charities of the Diocese of Springfield*, 225 Ill. App. 3d 519 (1992), Doe contends that this is no longer an issue of first impression and that Illinois has already expanded the tort of fraudulent misrepresentation outside of the business arena.

A close examination of the two cases relied upon by Doe, however, does not support her broad interpretation of those decisions. In both *Roe v. Jewish Children's Bureau of Chicago*, 339 Ill. App. 3d 119 (2003), and *Roe v. Catholic Charities of the Diocese of Springfield*, 225 Ill. App. 3d 519 (1992), the issues presented were the same: whether a cause of action for fraud should be recognized based upon an adoption agency's intentional misrepresentation of a child's health and psychological background. *Jewish Children's Bureau*, 339 Ill. App. 3d at 132-33; *Catholic Charities*, 225 Ill. App. 3d at 524. In both cases, the adoptive parents alleged that they told the adoption agencies that they wished to adopt only "normal, healthy" children (*Catholic Charities*, 225 Ill. App. 3d at 523), or only a child born of parents who were "normal mentally, intellectually, and emotionally, and who had no history of psychiatric problems" (*Jewish Children's Bureau*, 339 Ill. App. 3d at 123). In each instance, the adoption agency made statements to the adoptive parents that the children met their stated requirements, although the agencies knew that, in fact, the children did not. The adoptive parents relied upon the agencies' statements, adopted the children, and thereafter discovered that the

---

[11]*Amicus* further observes that disclosure under these circumstances would have subjected the Dillings to both criminal and civil penalties (410 ILCS 305/12, 13 (West 2002)), and it would have required them to confirm that their son had engaged in conduct that would have subjected him to a felony prosecution under the criminal transmission of HIV provisions of the Criminal Code of 1961 (720 ILCS 5/12–16.2 (West 2002)).

children either had a history of psychiatric and emotional problems combined with destructive behavior (*Catholic Charities*, 225 Ill. App. 3d at 523) or that a biological parent had a long history of mental-health impairment (*Jewish Children's Bureau*, 339 Ill. App. 3d at 124).

In both cases, the appellate court held that the adoptive parents could properly bring causes of action for fraudulent misrepresentation against the adoption agencies based upon the agencies' intentional misrepresentation with respect to the children's health and psychological backgrounds (*Catholic Charities*, 225 Ill. App. 3d at 524) or those of the biological parent (*Jewish Children's Bureau*, 339 Ill. App. 3d at 134-35). In arriving at this conclusion, the appellate court noted that numerous other states had recognized a cause of action for fraudulent misrepresentation in the adoption setting where the agencies had made similar false statements in connection with the adoptions. *Catholic Charities*, 225 Ill. App. 3d at 524-27. In following those cases, the court noted that because the defendants were agencies in the business of facilitating adoptions, they had sole knowledge of the medical backgrounds of the adopted children and therefore were the only entities with the ability to accurately and completely communicate that knowledge to the adoptive parents. The court underscored that a "central concern" in adoption cases is that "fraud by adoption agencies should be discouraged because it deprives the adoptive parents of the right to make an informed decision regarding the potential risks involved in the adoption of a child." *Jewish Children's Bureau*, 339 Ill. App. 3d at 134. Accordingly, it was therefore proper for the agencies to be held liable for failing to fulfill their duties of complete and honest disclosure.

We do not find these decisions to support Doe's argument that Illinois has recognized the tort of fraudulent misrepresentation in purely personal settings. Also, we do not find these decisions to be factually analogous to her case. We view these decisions as animated by the unique facts presented by adoption proceedings, wherein there is an inherent duty on the part of the agency to provide full and complete disclosure of the adopted child's background and history–information that is held exclusively by the agency. Furthermore, the state has a valid public policy interest in adoption proceedings, which are highly regulated (see 750 ILCS 50/1 *et seq*.

(West 2002)). Therefore, we find these cases factually distinguishable from the matter at bar and inapposite to Doe's argument.

In addition, Doe relies in her submission to this court–as did the appellate court in its opinion below–upon decisions rendered in other jurisdictions that have recognized a cause of action under the theory of fraudulent misrepresentation for the transmission of sexually transmitted diseases in support of her conclusion that the tort of fraudulent misrepresentation may be properly extended to purely personal interactions. See, *e.g.*, *Kathleen K. v. Robert B.*, 150 Cal. App. 3d 992, 198 Cal. Rptr. 273 (1984); *B.N. v. K.K.*, 312 Md. 135, 538 A.2d 1175 (1988); *R.A.P. v. B.J.P.*, 428 N.W.2d 103 (Minn. App. 1988). We disagree with Doe that such cases are factually analogous to the matter at bar.

Our examination of the cited cases from our sister states reveals that the tort of fraudulent misrepresentation has on occasion been extended to actions where the plaintiff has filed suit against the person *who transmitted* a sexually communicable disease to the plaintiff and not against third parties. As one court explained, "people who know that they have genital herpes have a legal duty to take reasonable care to prevent the disease from spreading, and that this duty generally includes, at a minimum, the duty to inform potential sex partners of the possibility of infection." *R.A.P.*, 428 N.W.2d at 109. There, the Minnesota Court of Appeals held that the fact that the defendant had "knowledge that she had a contagious, incurable, sexually transmissible disease was a material fact that she was obligated to disclose to [the plaintiff] to protect him from injury. [The plaintiff] therefore, has a potential claim against [the defendant] for her alleged fraudulent failure to disclose her genital herpes before beginning a sexual relationship with [the plaintiff]." *R.A.P.*, 428 N.W.2d at 109.

Similarly, in *B.N. v. K.K.*, the Maryland Supreme Court also held that the plaintiff had a cause of action under the theory of fraudulent misrepresentation for nondisclosure of the fact that the defendant had genital herpes. The court held that the defendant "had a general tort duty, at the least, to disclose his condition before engaging in intercourse with her." The court described this general duty as follows:

"One who knows he or she has a highly infectious disease can readily foresee the danger that the disease may be communicated to others with whom the infected person comes into contact. As a consequence, the infected person has a duty to take reasonable precautions–whether by warning others or by avoiding contact with them–to avoid transmitting the disease." *B.N.*, 312 Md. at 142, 538 A.2d at 1179.

See also *Kathleen K.*, 150 Cal. App. 3d at 996-97, 198 Cal. Rptr. at 276 (where defendant assured plaintiff, prior to engaging in sexual intercourse, that he was free of any contagious sexually transmitted diseases, although he knew that he had genital herpes, the "tortious nature" of defendant's conduct, combined with "the interest of th[e] state in the prevention and control of dangerous diseases," brought plaintiff's injury within the type of injury that has "significant public policy overtones" and plaintiff therefore made out a case for fraudulent misrepresentation).

Again, we find that these cases are factually distinguishable from the matter at bar. In each of the cited cases, the plaintiff sued the person who actually communicated the disease to him or her, and not a third person who may or may not have had information about the defendant's health. In the instant matter, Doe is not suing Albert, who allegedly infected her with HIV; rather, she is suing his parents. We find that these factual differences render the cited cases inapposite to Doe's argument. We further note that neither Doe in her argument to this court, nor the appellate court in its opinion below, cites to a single case in the country where a court has imposed liability under the tort of fraudulent misrepresentation against the parents of a competent adult tortfeasor for their failure to disclose information about that tortfeasor to a third party.

Accordingly, we hold that the appellate court incorrectly expanded the tort of fraudulent misrepresentation to the specific facts presented in the matter before us. The factual circumstances of the instant appeal are inappropriate for the recognition of this tort beyond its general historical application to cases arising in the commercial context. It was therefore error for the appellate court to hold that the tort of fraudulent misrepresentation applied in plaintiff's case.

Our holding that it is inappropriate to expand the tort of fraudulent misrepresentation to the facts of plaintiff's case is

supported by plaintiff's own inability to prove that she justifiably relied upon the alleged statements made by the Dillings. As noted previously, a critical element that must be established by a plaintiff in a fraudulent-misrepresentation claim is that he or she acted in justifiable reliance on the truth of the allegedly fraudulent statement. See, *e.g.*, *Connick,* 174 Ill. 2d at 496; *Hester*, 114 Ill. 2d at 288; *Soules*, 79 Ill. 2d at 285. The manner in which plaintiff's claim unfolded before the jury provides a clear illustration of why the tort of fraudulent misrepresentation should not have been expanded in this case.

Doe was a college-educated woman who was in her mid-40s and ran her own business at the time that she met Albert in April 1996. Doe testified that she was "very aware" of sexually transmitted diseases (STDs) and that HIV was such a disease. She stated that she had practiced safe sex in the past and that she did not want to expose herself to the risk of contracting a STD. After meeting Albert through a personal ad and beginning a steady dating relationship, Doe initiated a conversation with Albert about STDs, expressed her concerns about remaining free of STDs, asked him if he had anything to tell her in this regard, and believed what he told her. However, when she first saw Albert naked, she noticed what she acknowledged was "unusual" pigmentation on his genitalia. She asked him about it, and believed his explanation, despite the fact that, as Dr. Cornfield testified, such warts are generally known to be spread through sexual contact and considered a form of STD. This fact should have placed Doe on notice at that point in time that something could be amiss with respect to Albert's sexual health and that she ran a risk of potentially contracting an STD by engaging in sexual conduct with him.

Despite the fact that Albert's genitalia looked "unusual" to her, Doe began having unprotected sex with Albert. Around that time, Albert began complaining to her that he was dizzy and she noticed that he could not walk or stand up straight. Around this same time, Doe herself was experiencing severe flu-like symptoms, which the medical testimony at trial concluded was consistent with an acute HIV-infection. Within the next few months, Doe testified, she saw that Albert's health condition was changing, as he went from looking "healthy" when she first met him to looking worn out, tired, and thin, with "ashen looking" skin. Doe also testified that she traveled with

Albert to Reno, where Albert had an appointment to see a doctor for treatment of what she termed was Albert's "heavy-metal poisoning." Doe also testified that Albert showed her a lab printout of a hair analysis performed on him which, she stated, confirmed that he had "heavy-metals in his system."

We note that all of the above events occurred *before* Doe first met the Dillings in May 1997, which was a little over one year after she first met Albert. As stated, Doe's suit against the Dillings asserts that she justifiably relied upon their allegedly fraudulent statements regarding the true state of Albert's health and therefore delayed in discovering and treating her HIV infection. However, for the time period between April 1996 and May 1997, Doe could *not*, as a matter of law, have been inhibited by any statements made by the Dillings because she had not even met them. Indeed, during this time frame, the uncontradicted evidence established only that Doe relied on statements made to her by *Albert*–and not the Dillings–that his health ailments were solely caused by heavy-metal poisoning. Accordingly, any statements allegedly made by the Dillings thereafter were simply repetitive of what Doe *already* believed from independent sources. We note that, based upon the specific occurrences witnessed by Doe as outlined above, Doe should have been fairly suspicious of the true nature of Albert's health problems and, as Albert's sexual partner, should have also been concerned for her own health. Doe, however, chose not to heed any of the early warning signs that something was amiss with Albert's health and she declined to probe further.

In addition, Doe's own expert and treating physician, Dr. Till, provided uncontroverted testimony that because Doe was apparently infected in August 1996 as a result of unprotected sexual intercourse with Albert, she most likely would have seroconverted–or tested positive for HIV–at some time within six months of the exposure. Dr. Till surmised that Doe "most likely" would have seroconverted by spring 1997, before meeting the Dillings. As such, Doe had the independent means to discover that she herself had been infected with HIV through having her own blood tested if she would have chosen to consult with a health professional.

Approximately one week after she met the Dillings, Doe testified, Albert had to be taken to the emergency room because he had injected himself with ozone and had experienced what appeared to her to be

a stroke. Yet, this unusual event did not cause any inquiry on Doe's part; she simply accepted it. Doe testified that the topic of Albert's health came up repeatedly when she spoke with the Dillings, and she stated that she did not question anything that the Dillings allegedly told her. Doe testified that this remained the case even though Albert was rushed by ambulance to the emergency room on a second occasion in October 1998 after having once again experienced a stroke after injecting himself with ozone. Nevertheless, Doe did not question why a formerly healthy man in his mid-40s had suffered two strokes after injecting himself with a highly unusual substance, and did not see any correlation between Albert's declining condition and the potential risks to her own health as his sexual partner. Doe chose to believe the Dillings, even though she had seen with her own eyes that Albert had a stroke and experienced these occurrences firsthand.

Doe further testified that she believed everything that the Dillings told her, even after Doe and her mother rushed Albert to the local emergency room during their trip to Michigan over Christmas 1998 because Albert was in such abdominal distress that he was "screaming in pain," and even after he had showed her a toilet full of blood. We note that Doe never testified at trial with respect to any diagnosis that was made of Albert's condition at the Michigan hospital. Although Doe stated that she questioned Betty in January 1999 about whether Albert had AIDS, she also testified that she chose to believe the statements from the Dillings, rather than what she, herself, had experienced with Albert during their Michigan trip and what she had seen with her own eyes. Again, Doe chose to ignore her own eyewitness knowledge of Albert's rapid downward spiral and her own potential risk for health problems stemming from her sexual relations with him. Although Doe described her state at that time as "frantic" with respect to Albert's health, she nevertheless gave up on the idea of having Albert evaluated at the Mayo clinic when the Dillings declined to pay for the trip and treatment.

Doe also testified that Albert lived with her in her apartment for most of 1999 until his death and that she "did everything for him." Yet, even though Albert was deteriorating before her eyes, and even though Doe had knowledge about Albert's condition that the Dillings did not have because Doe lived with him on a daily basis, she still chose to ignore what she saw and experienced. The fact that a man in

his mid-40s had become totally dependent upon her for all of his daily care did not cause her to question what the Dillings had allegedly told her. Even when her own health started to similarly decline in the summer of 1999, Doe chose not to investigate, even though her symptoms would have caused a person of similar characteristics to obtain medical advice. Yet, she ignored each and every fact that pointed to the truth, which was that Albert had a very serious health problem and she–having had unprotected sexual relations with him–was at risk for contracting it.

We also note Doe's testimony with respect to Dr. Hauser's diagnosis in summer 1999 that Albert was suffering from Lyme disease. Doe stated that she immediately called Betty and told her, "We finally have a diagnosis. Now we know what's really wrong with Albert." Doe's statement that they "finally" had a diagnosis and that they now knew "what's really wrong with Albert" indicates that Doe had been harboring suspicions about the true nature of Albert's condition, and that she herself did not believe the Dillings' alleged statements that Albert was only suffering from heavy-metal poisoning and that he would get well. If she had completely believed the representations of the Dillings, there would have been no reason for Doe to make the statement that Dr. Hauser's diagnosis revealed the true source of Albert's deteriorating health.

Moreover, Doe testified at trial that she accompanied Albert on every visit to Dr. Hauser and had discussions with him about Albert's condition. When Dr. Hauser gave Doe a laboratory report which showed that Albert was suffering from Lyme disease, it was *Doe* who "immediately" called Betty with the news of this latest diagnosis. That Doe was the one who was informing Betty that Albert had Lyme disease shows that Doe was in a unique position of knowledge with respect to Albert's health condition and undermines Doe's argument that she relied upon the statements of the Dillings with respect to Albert's health ailments. It was Doe–and not the Dillings–who accompanied Albert to the doctor's office and discussed Albert's state of health personally with his physician. In fact, Doe stated that she "believed *** the doctor when he said Albert had Lyme disease." By her own testimony, Doe revealed that her reliance at that point with respect to Albert having Lyme disease was on Dr. Hauser and not the Dillings.

-26-

Further, we note that Doe testified that prior to taking Albert to see Dr. Waitley in November 1999, Betty told her for the first time that Albert had undergone a blood transfusion in connection with surgery on his shoulder in 1979. However, on cross-examination, Doe admitted that she already knew–prior to Betty's statement–that Albert had undergone a blood transfusion, but that Doe "doubted that information at that time." Again, we believe that a person with Doe's background and education would immediately recognize the risks posed by a blood transfusion that occurred in the late 1970s as a potential source of HIV infection and have a fair suspicion that there could be a connection between that event and the drastic decline in Albert's health. At the very least, such a person would be on notice that a tangible risk was presented to her own health in having sexual relations with him.

In addition, we note that the Dillings were not medical practitioners and that a person of the education and characteristics of Doe should have been aware of the fact that they were not the best source of information with respect to Albert's medical condition. As stated, Doe actually had greater access to information than did the Dillings with regard to the state of Albert's health, in that not only did she live with Albert and watch the state of his health rapidly decline on a daily basis, she also accompanied him to his medical appointments and discussed the state of Albert's health with his doctor as he became sicker and weaker. There is no evidence in the record that the Dillings accompanied Albert to any doctor's appointments or were privy to the same information that Doe was.

Doe argues, however, that these facts do not matter because Kirk "held himself out as a medical expert" and because Doe "considered herself the Dillings' daughter-in-law" and believed that she had been embraced into the family. Doe also claims that she was lulled into a false sense of security by the Dillings. A plaintiff possessing the same characteristics as Doe would likely have taken steps on her own to look into the health condition of her fiancé or, at the very least, to protect her own health by consulting with medical professionals and having herself checked, knowing that she could be at risk as a result of having sexual relations with him. Under the circumstances witnessed firsthand by Doe, nothing that the Dillings could have told

her could have erased the stark facts that she was presented with on a daily basis.

In addition, Doe was unable to support her claim that the Dillings knew, prior to November 1999, that Albert was HIV-positive. Although Kirk admitted that he was aware that Albert suffered from genital warts and had sent him to doctors for treatment of that specific condition, and Betty testified that Kirk on occasion conferred with Albert's doctors and from time to time received and reviewed reports from these doctors and shared the findings with her, there is no evidence that the records and reports received by Kirk revealed Albert's HIV status. In addition, we note that Doe did not show exactly what type of records and reports were being sent to Kirk by Albert's health-care providers. We also observe that at the time of his evidence deposition in 2003, Kirk steadfastly denied that Albert ever had AIDS and stated that it was his belief that Albert had been "misdiagnosed" as being HIV-positive and that he was "killed" as a result of being administered "drugs that caused his death in less than three weeks." Further, Doe did not show that Albert ever shared the truth of his condition with his parents.

Similarly, Doe did not show that Albert ever authorized any of his medical providers to discuss his HIV status with his parents. Although Dr. Cornfield testified that Albert disclosed to him over the phone in summer 1992 that he was HIV-positive, Dr. Cornfield did not state that he shared this information with Kirk. In fact, Dr. Cornfield testified that he did not personally know Kirk. In addition, although Dr. McGillen testified that during the course of examining Albert's medical records he observed the results of a blood test performed on Albert by Dr. Keller in 1992 and opined that, based upon the test results, Albert was infected with HIV as of December 1992, no evidence was adduced that Dr. Keller communicated these specific test results to Kirk. Although Dr. Keller may have been able to shed light on whether such a communication had made, we note that the record on appeal does not contain a deposition by Dr. Keller and that he was not called to testify at trial.

Further, we note that the Dillings' former son-in-law, James Walgreen, testified that he had been part of a conversation with the Dillings at the Dillings' home that he said took place "approximately a year before [Albert] passed away," meaning in November of 1998.

Walgreen stated that during this conversation Betty revealed that Albert had AIDS. Walgreen testified that when he responded that "someone should inform [Doe]," he was told by Kirk and Betty that they had not yet met Doe and that Walgreen should keep the information to himself. Walgreen's testimony that the Dillings stated that they had not yet met Doe as of November 1998 directly contradicts Doe's own testimony that she knew the Dillings from the time of their first meeting in May 1997.

In sum, Doe was unable to support her allegations that the Dillings in fact knew the truth of Albert's condition and that he had AIDS. In addition, Doe was unable to support her allegations that the Dillings were liable to her because they "concocted a story about Albert's phantom condition" of heavy-metal poisoning and Lyme disease and, thereby, fraudulently misrepresented his true condition to her. Similarly, she was unable to support her theory that the Dillings and the doctors to which Kirk referred Albert conspired together to lie to Doe about Albert's ailments. In fact, Doe's own testimony belied any argument that she had a "right to rely" upon the allegedly false representations of the Dillings: Doe not only had actual knowledge of facts that made her reliance unjustifiable, but she also could have easily discovered additional facts if she had not chosen to consciously ignore what was plainly in front of her. See *Soules*, 79 Ill. 2d at 286-87. Doe's difficulty in establishing her justifiable reliance on the alleged statements of the Dillings supports our holding today that the tort of fraudulent misrepresentation is not appropriately expanded to this purely personal setting where plaintiff seeks to hold the Dillings liable for their alleged failure to disclose and misrepresent the HIV status of their adult child.

Accordingly, we affirm that portion of the judgment of the appellate court which vacated the judgment entered on the jury's verdict finding defendants liable for fraudulent misrepresentation and awarding Doe compensatory damages, albeit for reasons different from those advanced by the appellate court.

We now briefly address the remainder of the issues raised by Doe before this court. Doe argues that the appellate court erred in affirming the judgment of the circuit court directing a verdict in favor of the Dillings on the negligent misrepresentation count. According

to Doe, the facts adduced at trial supported allowing the negligence claim to go to the jury. We disagree.

The tort of negligent misrepresentation

> "has essentially the same elements [as fraudulent misrepresentation], except that the defendant's mental state is different. The defendant need not know that the statement is false. His own carelessness or negligence in ascertaining its truth will suffice for a cause of action. [Citation.] For negligent misrepresentation, a plaintiff must also allege that the defendant owes a duty to the plaintiff to communicate accurate information." *Board of Education of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 452 (1989).

Because we have just held that the tort of fraudulent misrepresentation was improperly expanded to Doe's case, and because the elements of these two torts are essentially the same, the appellate court correctly affirmed the judgment of the circuit court directing a verdict on the negligent-misrepresentation count in favor of the Dillings. We therefore affirm the appellate court's judgment on this point.

Finally, Doe briefly argues that the appellate court erred in affirming the judgment of the circuit court directing a verdict in favor of the Dillings on Doe's claim for punitive damages in connection with the fraudulent-misrepresentation count. Because we have just held that the tort of fraudulent misrepresentation was improperly expanded in this case, Doe's argument with respect to the punitive damages claim for this count is moot. We therefore affirm the appellate court's judgment on this point.

CONCLUSION

For the foregoing reasons, we hold that the appellate court improperly expanded the tort of fraudulent misrepresentation to the specific facts in plaintiff's case. However, for the reasons set forth in this opinion, the appellate court properly vacated the judgment entered on the jury's verdict finding defendants liable for fraudulent misrepresentation and awarding Doe compensatory damages. Accordingly, we affirm the judgment of the appellate court.

JUSTICE BURKE took no part in the consideration or decision of this case.

JUSTICE KILBRIDE, specially concurring:

I agree with the majority's holding that the tort of fraudulent misrepresentation should not be extended to the specific facts of this case. I also agree with the majority's decision on the negligent misrepresentation and punitive damages claims that follows directly from the conclusion that fraudulent misrepresentation is inapplicable to these circumstances.

I disagree, however, with the majority's discussion of the sufficiency of the evidence on the element of justifiable reliance. The discussion of that element of fraudulent misrepresentation is completely unnecessary given our decision not to extend the cause of action to these facts. Additionally, I believe that the majority makes several errors in discussing justifiable reliance. The majority fails to set forth the law on that element or the deferential standard for reviewing the jury's finding that Doe justifiably relied upon the misrepresentations. If justifiable reliance is addressed, I believe that the applicable law on that element should be discussed and the evidence should be considered under the correct standard for reviewing a jury verdict. Accordingly, I specially concur.

Initially, the majority concludes that the tort of fraudulent misrepresentation should not be extended to these facts. That conclusion addresses the primary issue in this appeal and renders unnecessary any discussion of the sufficiency of the evidence to satisfy the elements of fraudulent misrepresentation.

The majority, nonetheless, goes on to discuss whether Doe justifiably relied upon the misrepresentations by the Dillings. The majority states "[o]ur holding that it is inappropriate to expand the tort of fraudulent misrepresentation to the facts of plaintiff's case is supported by plaintiff's own inability to prove that she justifiably relied upon the alleged statements made by the Dillings." Slip op. at 22-23. However, the decision whether to expand fraudulent misrepresentation to these facts is essentially a policy decision. In

deciding that issue, this court reviewed the historical application of fraudulent misrepresentation and concluded that the facts presented here "are inappropriate for the recognition of this tort." Slip op. at 22. That holding applies regardless of whether Doe presented evidence sufficient to establish any or all of the elements of fraudulent misrepresentation. In my view, this court should avoid discussion of the evidence on justifiable reliance because it is unnecessary to the decision.

I also believe the majority errs in failing to set forth the standard for justifiable reliance in its discussion of the evidence. The majority's only statement on the standard for justifiable reliance is that " 'the reliance upon the misrepresentation must have been justified, *i.e.*, the other party had a right to rely upon the statement.' " Slip op. at 16 (quoting *Charles Hester Enterprises, Inc.*, 114 Ill. 2d at 288, and citing *Soules*, 79 Ill. 2d at 286, and *Schmidt*, 20 Ill. 2d at 94).

The applicable standard for justifiable reliance originated in *Dillman v. Nadlehoffer*, 119 Ill. 567, 577 (1886), when this court explained that the inquiry focuses on whether "the plaintiff had a right to rely" upon the allegedly false representations. "[T]he representations must be viewed in the light of all the facts of which the plaintiff had actual notice, and also of such as he might have availed himself by the exercise of ordinary prudence." *Dillman*, 119 Ill. at 577. This statement on justifiable reliance has subsequently been recited and applied by this court. See *Soules*, 79 Ill. 2d at 286-87; *Schmidt*, 20 Ill. 2d at 94. In *Dillman*, this court explained the application of the rule, stating:

> "If, therefore, in thus considering the representations, it appears there were facts and circumstances present at the time they were made, sufficient to put the plaintiff upon his guard, or to cast a suspicion upon their truthfulness, and that he neglected to avail himself of the warning thus given, he would not afterwards be heard to complain, for the reason his own conduct contributed to the injury." *Dillman*, 119 Ill. at 577.

Although this explanation of the rule has not been included in this court's decisions subsequent to *Dillman*, it clarifies that there is no duty to investigate the truthfulness of a misrepresentation unless the facts and circumstances put the plaintiff on guard or cast suspicion

upon its truthfulness. At that point, the plaintiff must heed the warning given by the circumstances accompanying the statement.

This court's standard for justifiable reliance originated in *Dillman*, a case decided in 1886. Since then, the Restatement (Second) of Torts has provided another standard for justifiable reliance. Under the Restatement, the recipient of a fraudulent misrepresentation is justified in relying upon it unless "he knows that it is false or its falsity is obvious to him." Restatement (Second) of Torts §541, at 88 (1977).

I believe that section 541 of the Restatement provides the proper standard for justifiable reliance. A claim of fraudulent misrepresentation requires proof of a statement of material fact known or believed to be false and made with the intent to induce the other party to act. *Hester*, 114 Ill. 2d at 288. The claim involves an intent to deceive another and have that person act to their detriment upon the fraudulent misrepresentation. Thus, a claim of fraudulent misrepresentation contemplates a high degree of culpability. If the defendant engages in intentional deceit, the recipient of the misrepresentation should be allowed to rely upon the statement unless it is obviously false. The Restatement approach is supported by reason and logic. Accordingly, in the appropriate case, this court should consider adoption of the Restatement standard for justifiable reliance.

Additionally, in discussing the evidence on justifiable reliance the majority makes no statement whatsoever on the standard for reviewing the jury's verdict that Doe justifiably relied upon the Dillings' misrepresentations. When reviewing a jury's verdict, we are required to defer to the jury. A motion for judgment *n.o.v.* presents a question of whether, considering the evidence and all reasonable inferences in the light most favorable to the plaintiff, there is a total failure or lack of evidence to prove any element of the plaintiff's case. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006). If the evidence on justifiable reliance is discussed, it should be reviewed under this deferential standard.

In sum, I agree with the majority that the tort of fraudulent misrepresentation should not be expanded to the specific facts of this case. Given that conclusion, it is unnecessary to discuss the sufficiency of the evidence on justifiable reliance. The sufficiency of

the evidence on that element of fraudulent misrepresentation is wholly irrelevant to whether it is appropriate to recognize that tort in the specific circumstances of this case. Additionally, if the sufficiency of the evidence is reviewed, the majority should give deference to the jury's verdict. The majority's review of the evidence substitutes this court's judgment for that of the jury and usurps the jury's function of resolving questions of fact. For these reasons, I specially concur.